2003-NMCA-150

82 P.3d 554

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Mark RENDLEMAN and Tiffany Mia Barbosa, Defendants–Appellants.**

and

**State of New Mexico, Plaintiff–Appellant,**

v.

**Mark Rendleman and Tiffany Mia Barbosa, Defendants– Appellees.**

and

**State of New Mexico, Plaintiff–Appellant,**

v.

**Mark Rendleman, Defendant–Appellee.**

**No. 22129, 22207, 22208.**

Court of Appeals of New Mexico.

Oct. 27, 2003.

Certiorari Denied, Nos. 28,382, 28,385, Dec. 12, 2003.

748

Patricia A. Madrid, Attorney General, M. Anne Kelly, Assistant Attorney General, San- ta Fe, for Appellee in Docket No. 22,229 and for Appellant in Docket Nos. 22,207 & 22,208.

Peter Schoenburg, John L. Sullivan, Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Enfield, LLP, Dan Cron, Dan Cron Law Firm, P.C., Santa Fe, for Appellant Mark Rendleman in Docket No.22,129 and for Appellee Mark Rendleman in Docket Nos. 22,207 & 22,208.

Daniel R. Marlowe, The Marlow Law Firm, P.C., Santa Fe, for Appellant Tiffany Mia Barbosa in Docket No. 22,129 and for Appellee Tiffany Mia Barbosa in Docket No. 22,207.

## OPINION

BUSTAMANTE, J.

{1}  The opinion filed in this case on September 18, 2003, is hereby withdrawn and the following submitted therefor.  The motion for rehearing is denied in part and granted in part.

{2}  These consolidated cases present difficult procedural and substantive issues surrounding the enforcement of New Mexico's Sexual Exploitation of Children Act (the Act).  NMSA 1978, §§ 30–6A–1 to –4 (1984, as amended through 2001).  Indicted for multiple alleged violations of the Act based on photographs and video taken by them, Defendants filed a pretrial motion to dismiss arguing that the material is protected by the federal and state constitutional guarantees of free speech.  The district court dismissed some counts, but refused to dismiss others.  Defendants appeal the district court's refusal to dismiss the entire case, while the State cross appeals arguing none of the counts should have been dismissed.  Affirming in part and reversing in part, we address (1) the proper role of the trial court when considering a pretrial motion to dismiss an indictment on free speech grounds, (2) the nature of the conduct prohibited by the Act and the elements of proof required by the Act, and (3) the federal and state constitutional limits on prosecutions under the Act. Lastly, we will conduct our own review of the photographs.

{3}  We affirm the district court's rulings on the criminal sexual contact and child abuse counts.

## FACTS AND PROCEEDINGS

{4}  Defendant Mark Rendleman is an artist and former art professor who resides in Embudo, New Mexico located in Rio Arriba County.  Adjacent to his house, Rendleman has dug a labyrinth of tunnels and rooms into a hillside made of volcanic ash.  Spanning over an acre of land, the "cave" contains carvings of human figures and designs that are sculpted into the walls, as well as freestanding works of sculpture and painting which Rendleman and several other artists have created.  The cave has received public recognition in several articles and a film documentary.

{5}  Rendleman's daughter, Defendant Tiffany Mia Barbosa, is a documentary and commercial film maker residing in Santa Fe with her husband.  Barbosa was born to Rendleman and Elizabeth Stewart in 1975.  Stewart is also the mother of two of the alleged victims in this case, a boy and a girl, who were born in 1985 and 1986 respectively.  Barbosa is their half-sister.  Rendleman had another daughter, with Leslie Drobbin in 1990, and she is the third alleged victim in this case.

{6}  In three separate prosecutions by grand jury indictments in Santa Fe and Rio Arriba counties, Defendants Rendleman and Barbosa were charged with multiple counts of sexual exploitation of a child, criminal sexual contact of a minor, and child abuse.  The charges were based on Defendants' conduct associated with photographing the three children in various states of undress.

{7}  The boy and girl, who lived in California, first visited Rendleman at Embudo with their mother in 1995 when they were nine and eight years old.  During this visit, Defendants took a series of photographs which are referred to as the "Cave Shoot Photos."  According to the Defendants, the Cave Shoot Photos were taken in an effort to explore artistic themes of primitivism that Rendleman was interested in as an artist.  These photos, approximately twenty-nine total, depict the boy and girl, with and without Rendleman, or individually, engaged in what has been described as "a stylized portrayal of primitive cave people."  According to Rendleman, the Cave Shoot Photos reflect an effort to create images that have been incorporated into sculptures in the cave, including biomorphic thrones and totem poles, as well as visual repeating elements.

{8}  A second group of materials, referred to as the "Family Photos," include various photos of the three children playing in the river, playing with a snake, and playing make believe games, as well as certain unidentified videos described, but not shown, to the Grand Jury. Most of the Family Photos were taken while the children were visiting Rendleman at Embudo between 1995 and 1999, although six (four of which are duplicates) were taken of his daughter at her mother's home in Santa Fe. The girls are essentially naked in the majority of these twenty or so photos, whereas the few shots of the boy depict him fully clothed.

{9}  The Santa Fe grand jury indicted Rendleman, charging him with one count of sexual exploitation of his daughter, contrary to Section 30–6A–3(B) ("sexual exploitation") and one count of criminal sexual contact of a minor (the girl), contrary to NMSA 1978, § 30–9–13(A)(2)(a) (2001) ("CSC of a minor").  Rendleman was also charged in an indictment issued by the Rio Arriba grand jury with eighteen counts of sexual exploitation, eleven counts of CSC of a minor, contrary to Section 30–9–13(A)(1), and one count of abandonment or abuse of a child, contrary to NMSA 1978, § 30–6–1(B) (2001) ("child abuse").  The same grand jury also issued an indictment against Barbosa charging her with eight counts of sexual exploitation, eleven counts of CSC of a minor, and one count of child abuse.

{10}  Defendants moved to dismiss all charges, arguing the State's prosecution was unconstitutional as applied to them.  In particular, Defendants contended that prosecuting them for taking and possessing the photographs violated their rights to free speech under our state and federal constitutions.  Defendants urged that their speech was protected under either an obscenity standard or child pornography standard.  In their view, the photographs had artistic value and/or simply documented the children's daily activities and development for purely private fami-

ly purposes and in a way that was not lewd or sexually explicit as proscribed by the Act. Section 30–6A–3. Defendants also argued that the charges should be dismissed because the Act failed to provide adequate notice that photographs taken for artistic purposes or private family purposes would constitute a crime. In a supplemental motion to dismiss, Defendants also asked that the criminal sexual contact of a minor charges be dismissed because any contact was incidental to free expression and, thus, constitutionally protected.

{11} Defendants asserted that the district court had a gate-keeping responsibility to make a threshold determination whether the photos and video were constitutionally protected expressions. The State acknowledged that the district court did have a gate-keeping role to determine whether the conduct fell within the Act as a matter of constitutional law, but argued that the Act narrowly prohibited specific conduct and fell within the parameters of the United States Supreme Court's decision in *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). In *Ferber*, the Supreme Court held that sexually explicit material involving children was not entitled to First Amendment protection and that laws criminalizing production and distribution of such materials could constitutionally include visual images which would not be "obscene" under the three-part test of *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). *Ferber*, 458 U.S. at 760–61, 102 S.Ct. 3348. In the State's view, there was no constitutional question presented here because the materials came within the outer limits of the Act, depicting the children in lewd and sexually explicit poses, frequently with exposed genitalia being the main focus. Thus, the State argued that the question of whether the conduct was criminal was simply a question of fact for the jury.

{12} The district court held a five-day evidentiary hearing on the motion to dismiss. The court took testimony from Defendants Rendleman and Barbosa, Leslie Drobbin, two expert witnesses in the arts, and a forensic psychologist. Rendleman testified about his personal history, education and training in psychology and the arts, as well as his professional experience as an artist, photographer, and former art professor.

{13} Rendleman testified that he was exposed to nudity in his family, at school, and in his artistic life and considered it an asexual or anti-sexual form of expression. His artistic interests included photo realism-the study of how photos affect perceptions. The Cave Shoot Photos were intended as studies for potential sculptures in his cave; they represented primitivism, including digging tools, thrones, and totem poles. These photos were taken with the children's mother's permission. The Family Photos were some of thousands of photos that Rendleman took, documenting the lives of his children. Rendleman and his daughter's mother testified that the photos were not taken for the purpose of sexual stimulation. Rendleman testified that the Family Photos were kept in their original commercial envelopes, in chronological order, in his home.

{14} Two art experts in relevant fields testified on Rendleman's and Barbosa's behalf about the visual artistic process and opined that the Cave Shoot Photos were artistic expression, much like the art work of commercially well-known photographers and were not made for the purpose of sexual stimulation. Another expert, a psychologist, testified for the State that while some of the photos were a mundane documentation of family life or related to artistic projects, some of them were very similar to child pornography collected by pedophiles. He had no opinion as to Defendants' purpose in taking the pictures. This expert also testified that a pedophile might be stimulated from materials ranging from hard core child pornography to commercial publications, or even a clothing catalog.

{15} Defendant Barbosa also testified about her early childhood with her mother in California, her relationship with her father, her education and training in film making and visual anthropology, as well as her professional experience as a documentary and commercial film maker. She recalled early memories of her father always photographing everything, and from the first time she

came to Embudo, nudity was a natural part of daily life.

{16} Following the hearing, the district court issued a decision with detailed findings and conclusions, ultimately dismissing the counts based on the Family Photos, but denying Defendants' request to dismiss counts based on the Cave Shoot Photos. Several of the findings described Defendants' upbringing and family life, which included an open appreciation for nudity and a nudist lifestyle. The district court also outlined Defendants' formal art education and art-related careers. In addition, the district court's findings acknowledged that many of the photographs for which Defendants are being prosecuted are similar to photographs taken by other well-known photographers and published in standard academic texts and books by art photographers.

{17} The district court described many of the photos that formed the basis for the criminal sexual conduct charges against Defendants in specific detail, but appeared to rely on the categorization of the photos as the Cave Shoot Photos and the Family Photos to make its final determination as to the sexual exploitation charges. Ultimately, this categorization determined how the district court resolved Defendants' motion to dismiss.

{18} With regard to the Cave Shoot Photos, the district court found that they presented a factual issue for a jury to resolve concerning whether they were taken for artistic purposes or for other purposes amounting to sexual exploitation of, or criminal sexual contact with, the children. Although the district court acknowledged that these photos were taken in a staged manner, it found that whether the children intelligently and voluntarily participated in the taking of them was also a question for the jury to decide. In light of these findings, the district court concluded that the counts related to the Cave Shoot Photos should not be dismissed because issues of fact existed concerning the purpose or reason why they were created and whether they have serious artistic value, are patently offensive, or appeal to the prurient interest according to prevailing community standards.

{19} With regard to the Family Photos, the district court found that they were clearly spontaneous, unstaged photos taken in an attempt to chronicle the ordinary daily events in the lives of the children, such as playing and bathing. The court further found that the photos do not involve real, simulated, or suggested sexual activity and do not evidence an intent to produce sexual activity. In light of these findings, the district court concluded that the "Family Photos" were not lewd because they simply "capture uninhibited moments of adolescent spontaneity." The district court also concluded the photos were not made for the purpose of sexual stimulation, but were fundamentally private family photos that were a legitimate effort by a parental figure to document the activity and development of his children. Finally, the district court concluded that the State lacked a legitimate interest in prohibiting the types of images reflected in the Family Photos because they represented the mere private possession of innocuous photographs of naked children. As a result, the district court dismissed all charges relating to the Family Photos.

## DISCUSSION

### I. Pretrial Motion

#### Preservation

{20} As a preliminary matter, Defendants argue that the State failed to preserve an objection to the district court's decision to hold a pretrial hearing. Defendants point out that the State agreed during the hearing that the district court had a gatekeeping role before the matter was turned over to the jury. The State responds that it did not waive the issue because it repeatedly argued that it was improper for the trial court to decide factual questions that were for the jury to decide. The record reflects that the State suggested the court could not review the sufficiency of the evidence to support the indictment, absent a showing of bad faith on its part, and that it was, therefore, inappropriate for the court to make factual findings as a means to dismissing portions of the indictment. As such, we find the State preserved the issue of whether the district court overstepped the bounds of its authority

to dismiss portions of an otherwise valid indictment.

### Analysis

{21} Supreme Court Rule 5-601(B) NMRA 2003 provides that "Any defense, objection or request which is capable of determination without a trial on the merits may be raised before trial by motion." The contours of the district court's power to conduct a pretrial hearing on a motion to dismiss charges brought under the Act on constitutional grounds under this Rule is a legal question of first impression in New Mexico. Questions of law are reviewed under a de novo standard. *State v. Roman*, 1998-NMCA-132, ¶ 8, 125 N.M. 688, 964 P.2d 852.

{22} The State generally argues that the district court has no authority to dismiss a valid indictment for insufficient evidence, absent a showing of bad faith. Since there is no claim of bad faith, the State contends that the prosecution has unfettered discretion, under separation of powers principles, to decide whether or not to prosecute and what to charge, so long as there is probable cause to support the charges. The State also asserts that the testimony it presented through its expert was sufficient to raise a factual dispute as to whether the photos were made for the purpose of sexual stimulation. The State concludes that the pretrial dismissal of charges for insufficient evidence was an improper ruling on factual questions that invaded the province of the jury. *See* NMSA 1978, § 31-6-11(A) (1981) ("The sufficiency or competency of the evidence upon which an indictment is returned shall not be subject to review absent a showing of bad faith on the part of the prosecuting attorney assisting the grand jury."). As to the constitutional issues, the State again acknowledges the district court has some gate-keeping role to determine constitutional questions, but argues there was no threshold determination to be made in this case. The State argues, as it did below, that under *Ferber* child pornography, as defined by state law, is not protected speech, and whether Defendants' conduct falls within the Act is purely a question of fact for the jury. The State also argues that,

even under an obscenity standard, pretrial review is not appropriate.

{23} Defendants counter that the constitutional protection of speech requires they be given a pretrial opportunity to show that the photographs are lawful and not lewd as a matter of law and constitutional fact. A pretrial opportunity to show the conduct was not sexual in nature, in Defendants' view, is essential to prevent chilling constitutionally protected expression. Defendants conclude a gate-keeping role is particularly appropriate where, as here, the State does not contend that overt sexual conduct is depicted, but rather that the display involves a "lewd" display of the genitals.

{24} The State points to a number of cases from New Mexico that discuss the very limited extent to which a district court may override the State's decision to prosecute because of governmental misconduct. *See State v. Brule*, 1999-NMSC-026, ¶ 14, 127 N.M. 368, 981 P.2d 782; *Buzbee v. Donnelly*, 96 N.M. 692, 697, 634 P.2d 1244, 1249 (1981); *In re Jade G.*, 2001-NMCA-058, ¶¶ 21-25, 130 N.M. 687, 30 P.3d 376. However, Defendants do not argue that the prosecution here amounts to the type of governmental misconduct addressed in these cases. Accordingly, they are of limited value in trying to determine whether the district court acted properly in this instance.

{25} The State also cites to a number of cases holding that a district court may not dismiss an indictment in advance of trial by making factual determinations concerning the elements of the crime charged. *See State v. Eder*, 103 N.M. 211, 214-15, 704 P.2d 465, 468-69 (Ct.App.1985); *State v. Masters*, 99 N.M. 58, 60, 653 P.2d 889, 891 (Ct.App. 1982); *State v. Mares*, 92 N.M. 687, 688-90, 594 P.2d 347, 348-50 (Ct.App.1979). In *Mares*, for example, we reversed the district court's dismissal of an indictment charging the defendant with aggravated battery (firearm enhancement), holding that the lawfulness of the defendant's conduct was not capable of determination without a trial on the merits. *Id.* at 689, 594 P.2d at 349.

{26} These cases place appropriately sharp limits on judicial pretrial fact-finding. However, they are not directly relevant to

our inquiry for two reasons. First, none of them involve free speech defenses to prosecution. Free speech defenses raise issues separate and apart from proof of the elements of a particular crime. *Roth v. United States,* 354 U.S. 476, 498, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (Harlan, J., concurring in part and dissenting in part) noted that the "question whether a particular work is [obscene] involves not really an issue of fact but a question of constitutional *judgment* of the most sensitive and delicate kind." Second, as we understand it, Defendants are arguing they are entitled to dismissal as a matter of law with no need to resolve any disputed questions of fact.

{27} New Mexico courts have held that under Rule 5–601(B) a court may rule pretrial on legal questions that involve predicate facts underlying the charges where those facts are undisputed. *See State v. Foulenfont,* 119 N.M. 788, 789, 895 P.2d 1329, 1330 (Ct.App.1995); *see also State v. Ogden,* 118 N.M. 234, 239, 880 P.2d 845, 850 (1994). In *Foulenfont,* the defendant argued that the predicate facts underlying a burglary charge, entry of a fenced area, did not fit within the statutory definition of burglary. Distinguishing *Mares* where "lawfulness" was a factual issue, the Court noted there was no dispute that the burglary charges were predicated on the act of climbing the fence. *Foulenfont,* 119 N.M. at 789, 895 P.2d at 1330. Thus, the dispute focused on the legal issue of whether a fence came within the definition of "structure" in the burglary statute. We held that because the predicate facts were undisputed, the question of whether a fence was a structure under the burglary statute was purely a legal question. *Id.* at 790, 895 P.2d at 1331 (holding that a motion to dismiss an aggravating circumstance from a death penalty case could be decided pretrial if the issue could be decided as a matter of law).

{28} In cases under the Act, the prosecution relies primarily, if not solely, on documentary evidence, i.e., the photographs. *See People v. Lewis,* 305 Ill.App.3d 665, 238 Ill. Dec. 679, 712 N.E.2d 401, 408 (1999) (determination of whether photo is lewd can be made by "looking at the photo itself"); *People v. Bimonte,* 187 Misc.2d 677, 726 N.Y.S.2d 830, 836 (Crim.Ct.2001) (whether a photograph is lewd is "based on an analysis of the overall content of the visual depiction"); *accord United States v. Villard,* 885 F.2d 117, 122 (3d Cir.1989); *People v. Lamborn,* 185 Ill.2d 585, 236 Ill.Dec. 764, 708 N.E.2d 350, 355 (1999). In some ways, the photos may be viewed as undisputed facts; absent other evidence, they may either meet certain statutory criteria on their face or they may not. *Compare Bimonte,* 726 N.Y.S.2d at 836 (looking only at the photographs), *with United States v. Knox,* 32 F.3d 733, 738, 745–46 (3d Cir.1994) (looking at the photographs together with their promotional material proclaiming that although the subjects are clothed, the suggestiveness of their clothing and postures is "almost like seeing them naked (some say even better)," in ruling that nudity is not required to satisfy lascivious exhibition of genitals or pubic area portion of the statute).

{29} Section 30–6A–3(C) provides:

It is unlawful for a person to intentionally cause or permit a child under eighteen years of age to engage in any prohibited sexual act or simulation of such an act if that person knows, has reason to know or intends that the act may be recorded in any ... visual or print medium.

The Act defines "prohibited sexual act" as including a "lewd and sexually explicit exhibition with a focus on the genitals or pubic area of any person for the purpose of sexual stimulation." Section 30–6A–2(A)(5).

{30} For a photograph to be criminal under the Act, it must meet each of these criteria. If the photo does not meet statutory criteria on its face, it is not legally sufficient to uphold a conviction or support a prosecution. We agree that a determination of "lewdness" and "purpose" are essentially factual questions. However, in some instances the question of whether a photo focuses on the genitals or pubic area is apparent on the face of the photo and therefore can be dealt with as an undisputed fact—the photo either focuses on the area or it does not. If the photo does not focus on these areas, the question of intent is not reached. Thus, unlike *Mares* where the State's proffer of evidence highlighted the issue of lawfulness, the

State expert's testimony regarding whether a pedophile might be stimulated by a photograph is irrelevant if the photo does not focus on the genitals or pubic area of the child.

■ {31} Accordingly, we hold that on a pretrial motion to dismiss charges alleging the sexual exploitation of children, the district court may dismiss the charges where, on the undisputed face of the materials before the court, a jury could not find beyond a reasonable doubt that the material meets the elements of the offense as defined by the Act. Under these limited circumstances, no practical purpose would be served by a trial on the merits, and "[d]ismissal [is] therefore an appropriate and effective means of promoting judicial efficiency ... in light of the dispositive issue before the district court." *Foulenfont*, 119 N.M. at 790, 895 P.2d at 1331.

■ {32} As a constitutional matter, our precedent also supports a rule that the district court has a duty to conduct an independent review to ensure unprotected speech falls within the narrow limits of the Act and to ensure that protected speech is not criminalized. Contrary to the State's argument that it has discretion to charge whatever and whomever it desires, the separation of powers doctrine does not justify depriving a person of his or her constitutional rights. *See Brule*, 1999–NMSC–026, ¶¶ 14, 17, 127 N.M. 368, 981 P.2d 782 (recognizing in dicta that the separation of powers principle would not "justify depriving a defendant of his or her due process right to be free from vindictive prosecution"). Rather, the court has a duty "to scrutinize charging decisions in limited appropriate cases that seek to circumvent ... constitutional safeguards." *State v. Isaac M.*, 2001–NMCA–088, ¶ 15, 131 N.M. 235, 34 P.3d 624 (concluding the evidence did warrant dismissal on the basis of prosecutorial vindictiveness underlying prosecutor's decision to file information after grand jury returned no bill); *see State v. Smallwood*, 94 N.M. 225, 228–29, 608 P.2d 537, 540–41 (Ct. App.1980) (reversing trial court decision to dismiss information on grounds of cruel and unusual punishment but implying that if constitutional defense were viable, dismissal would be proper); *see also Bose Corp. v. Consumers Union of United States, Inc.*, 466

U.S. 485, 504–05, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (noting special facts of constitutional significance in categories including child pornography imposes special responsibilities on courts to ensure speech falls within the narrow limits of the unprotected category and to confine the perimeters of the unprotected speech).

■ {33} The United States Supreme Court has held that while independent appellate review may be adequate to protect free speech values, *"no one* will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct." *Jenkins v. Georgia*, 418 U.S. 153, 160, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974) (quoting *Miller*, 413 U.S. at 27, 93 S.Ct. 2607) (emphasis added). Consequently, the Court has held that "[e]ven though questions of appeal to the 'prurient interest' or of patent offensiveness are 'essentially questions of fact,' ... juries [do not] have unbridled discretion in determining what is 'patently offensive.'" *Id.* Rather, a court has a duty to make a threshold determination of whether material that is alleged to be obscene is the type of hard core pornography that is unprotected speech. *Id.* at 160–61, 94 S.Ct. 2750; *Bose Corp.*, 466 U.S. at 505, 104 S.Ct. 1949. In doing so, the court evaluates the "special facts that have been deemed to have constitutional significance." *Id.* at 505, 104 S.Ct. 1949. In other words, a court has a responsibility to review and determine whether the material cannot, as a matter of constitutional law, be found to be unlawful. *Id.; Jenkins*, 418 U.S. at 161, 94 S.Ct. 2750; *United States v. Various Articles of Merch.*, 230 F.3d 649, 653 (3d Cir.2000).

{34} The doctrinal and practical implications of the nature of the free speech defense in these cases is best encapsulated by Frederick F. Schauer, an early and respected commentator on obscenity law:

Since [under *Jenkins* ] there must be an independent legal determination of the issue of obscenity, it is appropriate that the issue may be decided in the context of a motion to dismiss the indictment, or similar motion, on the grounds that the material is not [unprotected speech] as a matter

of law. Since this process of independent legal review by the court must occur at some point, there is no logical reason why it cannot occur prior to trial, thus saving the time and expense of a trial if the material is clearly constitutionally protected as a matter of law. . . . If it is clear that the material is not [unprotected] as a matter of law, then the indictment should be dismissed without the necessity of hearing extensive evidence. If the issue is close enough that the judge, in making his independent legal determination, desires the assistance of evidence other than the material itself, this is available during the trial itself. If, at that point, the judge feels that the material is constitutionally protected, he can direct a verdict before the case is actually given to the jury.

Frederick F. Schauer, *The Law of Obscenity* 149 (1976).

■ {35} We hold that when a defendant raises constitutional free speech defense to charges under the Act, the district court may conduct a limited pretrial review of the materials upon which charges rest to determine whether the materials meet constitutional requirements. *United States v. Pinkus,* 333 F.Supp. 928, 929 (C.D.Cal.1971) (dismissing indictments because materials were not obscene as a matter of law under existing precedent); *United States v. New Orleans Book Mart, Inc.,* 328 F.Supp. 136, 140 (E.D.La. 1971) (refusing to dismiss indictments for transporting obscene material pretrial but acknowledging trial court responsibility "to make an independent constitutional judgment as to whether the material involved is constitutionally protected"); *People v. Biocic,* 80 Ill.App.2d 65, 224 N.E.2d 572, 574–75 (1967) (upholding dismissal of indictment for sale of nudist magazine because magazines were not obscene as a matter of law).

{36} Our decision is consistent with article VI, § 1 of the New Mexico Constitution which has been interpreted to grant courts an inherent power to exercise authority essential to their judicial function and management of their caseload, even absent express statutory authority or court rule. *State v. Gonzales,* 2002–NMCA–071, ¶¶ 21–22, 132 N.M. 420, 49 P.3d 681; *In re Jade G.,* 2001–

NMCA–058, ¶¶ 27–29, 130 N.M. 687, 30 P.3d 376 ("[A] court's inherent authority extends to all conduct before that court and encompasses orders intended and reasonably designed to regulate the court's docket, promote judicial efficiency, and deter frivolous filings.") (internal quotation marks and citation omitted). As guardians of the constitution, the function of the court is to enforce the rights it guarantees and further the intent of its provisions. *State ex rel. Udall v. Pub. Employees Ret. Bd.,* 120 N.M. 786, 793, 907 P.2d 190, 197 (1995); *see also Subin v. Ulmer,* 2001–NMCA–105, ¶ 13, 131 N.M. 350, 36 P.3d 441 (noting that courts, as guardians of the constitution, may order executive departments to make funding available without violation of separation of powers doctrine). Moreover, "[a]s long as the court's discretion in dismissing [cases] is limited and exercised with great caution, there is no separation of powers violation." *Gonzales,* 2002–NMCA–071, ¶ 22, 132 N.M. 420, 49 P.3d 681.

{37} Based on the foregoing, we articulate a two-prong inquiry for the district court to conduct on a defendant's motion to dismiss charges under the Act. As an initial matter, the district court should review the material to ensure it meets statutory guidelines. *Schlieter v. Carlos,* 108 N.M. 507, 510, 775 P.2d 709, 712 (1989) ("It is an enduring principle of constitutional jurisprudence that courts will avoid deciding constitutional questions unless required to do so."). The court then reviews the material to ensure constitutionally protected speech is not prosecuted. We will detail the nature and scope of constitutional pretrial review below.

■ {38} We emphasize that, as a pretrial matter, the question of whether the material meets *statutory* criteria is a limited inquiry. When considering whether material falls within the Act, as a pretrial matter, the district court may consider only the photos themselves. If the court finds the material depicts conduct proscribed under the Act, and after applying the standards set forth below, it passes constitutional muster, the jury must decide disputed factual issues, such as whether the photo was taken for a sexual purpose or some other legitimate purpose. On the other hand, if the photograph

does not depict the conduct proscribed by the Act, the court must dismiss any related charge of sexual exploitation as a matter of law.

## II. Prohibited Conduct Under the Act

{39} Defendants argue that under the Act the photos must contain explicit sexual conduct that focuses on the genitals. Defendants also urge the Court to consider extrinsic evidence of their purpose in taking the photos. In contrast, the State asserts that photos of naked children with bare buttocks or genitals merely visible fall within the Act if a jury could find there was a sexual purpose behind the photo.

{40} We construe the Act to clarify its meaning and application, applying a de novo standard of review. *Morgan Keegan Mortgage Co. v. Candelaria*, 1998–NMCA–008, ¶ 5, 124 N.M. 405, 951 P.2d 1066. We disagree with the State's position that an appellate court may not engage in statutory construction before a trial on the merits. *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988) (discussing deferential role of appellate court in determining sufficiency of the evidence). Rather, we believe this Court can and must interpret the statute to clarify what conduct is prohibited. *See State v. Barragan*, 2001–NMCA–086, ¶ 24, 131 N.M. 281, 34 P.3d 1157 ("Although framed as a challenge to the sufficiency of evidence, Defendant's argument requires us to engage in statutory interpretation to determine whether the facts of this case, when viewed in the light most favorable to the verdict, are legally sufficient to sustain a conviction.").

{41} To begin our discussion, some historical context is appropriate. New Mexico's first law prohibiting the visual sexual exploitation of children appeared as a category of child abuse in 1978 and simply banned the "lewd exhibition of the genitals or pubic area." 1978 N.M. Laws ch. 103, § 1(A)(3)(e). In 1984, two years after *Ferber* was decided, our legislature made the sexual exploitation of children a separate crime and added the purpose prong, censuring the "lewd exhibition of the genitals or pubic area ... *for the purpose of sexual stimulation.*" 1984 N.M. Laws ch. 92, §§ 1 and 2(A)(5) (emphasis add-

ed). The definition was further refined in 1993 to read: "lewd *and sexually explicit* exhibition *with a focus on* the genitals or pubic area ... for the purpose of sexual stimulation." 1993 N.M. Laws ch. 116, § 1(A)(5) (emphasis added). The 1993 amendment, under which Defendants were charged, was enacted one year after this Court held that the free speech provision of the New Mexico Constitution is broader than the First Amendment and restricts only "intolerable" obscene material. *City of Farmington v. Fawcett*, 114 N.M. 537, 546, 843 P.2d 839, 848 (Ct.App.1992).

{42} The portion of Section 30–6A–2(A)(5) which defines the "prohibited sexual act" consists of three discreet elements: (1) "lewd and sexually explicit exhibition"; (2) "focus on the genitals or pubic area of any person"; (3) "for the purpose of sexual stimulation." Assuming that the legislature chose this language to comply with the federal and state constitutions and to narrowly limit and define the proscribed conduct, the language should be read together and each of these elements must be present for the conduct to be unlawful and unprotected speech. *State v. Cleve*, 1999–NMSC–017, ¶ 14, 127 N.M. 240, 980 P.2d 23 (stating that legislature is presumed to act with knowledge of relevant case law); *State ex rel. Haragan v. Harris*, 1998–NMSC–043, ¶ 23, 126 N.M. 310, 968 P.2d 1173 (Serna, J. dissenting) (stating that legislature is presumed to enact laws that are constitutional); *see also Ortiz v. Taxation & Revenue Dep't*, 1998–NMCA–027, ¶ 5, 124 N.M. 677, 954 P.2d 109 ("A strong presumption of constitutionality surrounds a statute."). If any one element is missing, a jury could not find, as a matter of law, that the defendant violated the Act. We, therefore, construe each element of the Act.

{43} In an effort to apply an objective standard to an otherwise subjective concept, most courts have adopted the *"Dost factors"* to help determine whether a photograph involving a child is lewd. *See United States v. Dost*, 636 F.Supp. 828, 832 (S.D.Calif.1986), *aff'd, United States v. Wiegand*, 812 F.2d 1239, 1244 (9th Cir.1987). These factors include consideration of whether: (1) the focus is on the genital or pubic area; (2) the

setting is sexually suggestive; (3) the child is depicted in an unnatural pose, or in inappropriate attire, considering the child's age; (4) the child is fully or partially clothed; (5) the depiction suggests sexual coyness or a willingness to engage in sexual activity; and (6) the depiction is designed to elicit a sexual response in the viewer. *Dost,* 636 F.Supp. at 832. *Dost* helps organize the review of visual material based on its overall content using the factors as objective criteria for the analysis. *Villard,* 885 F.2d at 122. While most courts have held that not all factors need be present, *see, e.g., id.,* the Act expressly requires the first and last factor to be shown for a determination that the material is "lewd." *See* § 30–6A–2(A)(5). We adopt the *Dost* factors as an aid in the determination of whether a depiction is "lewd" under the Act. The *Dost* factors serve only to assist the court or the jury in an evaluation of the statutory elements, including whether it is a sexually explicit exhibition, what is its focus, and what is its intended purpose, which we address next.

■{44} First, we clarify the phrase, "sexually explicit exhibition." An "exhibition" requires an objective showing, apart from the child's genitalia being merely visible. *See People v. Pinkoski,* 188 Misc.2d 588, 729 N.Y.S.2d 585, 588 (County Ct.2001). Webster's defines "exhibition" as "showing, evincing, or showing off." To "exhibit" is to "show or display ... outwardly esp[ecially] by visible signs or actions; ... to have as a readily discernible quality or feature; [or] ... to represent or make clear by a drawing, plan or other visual means." Webster's New Int'l Dictionary 796 (3d ed.1986). The word "explicit" is "characterized by full clear expression; being without vagueness or ambiguity: leaving nothing implied: unequivocal" *Id.* at 801. In the context of the Act then, a "lewd and sexually explicit exhibition" means a visible display or readily discernible depiction of a child engaged in sexually provocative conduct. In other words, the photograph must be identifiable as hard-core child pornography; that is, it must display visible signs of sexual eroticism, rather than merely depict a naked child. This is consistent with the language of the Act which proscribes "lewd and sexually explicit exhibition with a focus on the genitals or pubic area of any person for the purpose of sexual stimulation." Section 30–6A–2(A)(5).

■ {45} In addition, the plain language of the Act requires the photograph to "focus on the genitals or pubic area." *State v. Johnson,* 1998–NMCA–019, ¶ 22, 124 N.M. 647, 954 P.2d 79 (rejecting interpretation of statute that would make parts of it mere surplusage or meaningless); *see State v. Javier M.,* 2001–NMSC–030, ¶ 32, 131 N.M. 1, 33 P.3d 1 (construing statute so that no part is surplusage). For the conduct to be unlawful, the depiction must clearly focus on the groin area of a child. Focus can be determined by photographic elements, such as design, composition, lighting, positioning, attire, and setting.

{46} The most difficult element to articulate is the sexual purpose prong. The definition of the prohibited sexual act incorporates a specific intent element—the photo must be taken for the purpose of sexual stimulation. The question is, what standard do we apply to determine sexual purpose?

> Is this a subjective or objective standard, and should we [evaluate] the response of an average viewer or the specific defendant in [the] case? Moreover, is the intent to elicit a sexual response analyzed from the perspective of the photograph's composition, or from extrinsic evidence (such as where the photograph was obtained, who the photographer was, etc.)?

*United States v. Amirault,* 173 F.3d 28, 34 (1st Cir.1999) (questioning standard used to determine whether photo is intended or designed to elicit sexual response in the viewer as the most confusing and contentious of the *Dost* factors).

■ {47} Under an objective standard, the central question is whether, based on the overall content of the photograph, a reasonable person could find the photograph was intended to elicit a sexual response. *Lewis,* 238 Ill.Dec. 679, 712 N.E.2d at 410. "Application of [an] objective standard requires [courts] to focus on the photograph itself, and not on the circumstances surrounding the taking of the photograph." *Lamborn,* 236 Ill.Dec. 764, 708 N.E.2d at 357. In short,

"the pictures speak for themselves." *Lewis*, 238 Ill.Dec. 679, 712 N.E.2d at 410 (internal quotation marks and citation omitted).

■ {48} The premise behind an objective intent analysis is that child pornography is not created and the Act is not violated simply because a person derives sexual enjoyment from otherwise innocent photographs. *See Amirault*, 173 F.3d at 34 (doubting whether "focusing upon the intent of the deviant photographer is any more objective than focusing upon pedophile-viewer's reaction; in either case, a deviant's subjective response could turn innocuous images into pornography"); *Villard*, 885 F.2d at 125; *Wiegand*, 812 F.2d at 1245. Rather, the focus is on the harm to the child that flows from trespasses against the child's dignity when treated as a sexual object. *Id. United States v. Wolf*, 890 F.2d 241, 246 (10th Cir. 1989); *Villard*, 885 F.2d at 125; *see also Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 122 S.Ct. 1389, 1403, 152 L.Ed.2d 403 (2002) (reasoning that the "mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it" and legislation "cannot [be] constitutionally premise[d] . . . on the desirability of controlling a person's private thoughts.") (citation omitted). In other words, it is not a defendant's private reaction that transforms an innocent photo into a lewd exhibition, but rather the objectively ascertainable intended effect on the viewer. *Lamborn*, 236 Ill.Dec. 764, 708 N.E.2d at 355–56.

■ {49} Only if the photo itself raises a question of illegal purpose (if a jury could find it pornographic) should it be submitted to the jury to make a finding on the objective evidence and subjective intent of the photographer. At trial, the subjective motive of the photographer, the circumstances of the photography, and the use of the photo become relevant on the issue of intent. If the trial court believes it is useful and manageable, the *Dost* factors may be considered by the jury as evidence of sexual purpose. *See Villard*, 885 F.2d at 125 (noting that rather than being a separate substantive inquiry, the sixth *Dost* factor is a means to determine if any of the other factors are present); *see*

also *State v. Saulsbury*, 243 Neb. 227, 498 N.W.2d 338, 344 (1993).

## III. Constitutional Limits on Prosecution Under the Act

{50} As a preliminary matter, Defendants argued below that the Act was void for vagueness as applied to them. However, Defendants do not raise a vagueness challenge on appeal. We, therefore, do not consider this issue. *See Fleming v. Silver City*, 1999–NMCA–149, ¶ 3, 128 N.M. 295, 992 P.2d 308 (holding issues raised in docketing statement but not argued in the brief in chief are deemed abandoned).

{51} We perceive three constitutional questions on appeal: first, whether our state constitution requires an obscenity standard be applied to Defendants under the 1993 statute or whether they may be prosecuted under the *Ferber* pornography standard; and second, if the constitution requires an obscenity standard, whether the *Miller* test is to be applied under the Act using the "intolerable" standard we articulated in *Fawcett*, 114 N.M. at 548, 843 P.2d at 850 and third, the nature and scope of the district court's gate-keeping role.

{52} The 1993 version of the Act under which Defendants are being prosecuted is silent on the issue of whether a general obscenity standard or a *Ferber*-derived child pornography standard should be applied to prosecutions under the Act. *See* 1993 N.M. Laws ch. 116, §§ 1, 2. After Defendants were indicted, the legislature amended the Act to incorporate an obscenity standard. *See* 2001 N.M. Laws ch. 2, §§ 1(E). As of 2001, the Act prohibits only obscene depictions of children under eighteen engaged in prohibited sexual acts or their simulation as defined under Section 30–6A–2(A). Section 30–6A–3(C). Adopting the *Miller* criteria for obscenity, the legislature defined "obscene" as "any material, when the content if taken as a whole: (1) appeals to a prurient interest in sex, as determined by the average person applying contemporary community standards; (2) portrays a prohibited sexual act in a patently offensive way; and (3) lacks serious literary, artistic, political or scientific val-

ue." Section 30–6A–2(E); compare *Miller*, 413 U.S. at 24, 93 S.Ct. 2607.

{53} The State urges this Court to apply a *Ferber* pornography standard to the 1993 Act. Under *Ferber*, visual material depicting children can be criminalized even if it is not obscene. The trier of fact need not consider whether the material appeals to prurient interest or is patently offensive and need not consider the material as a whole. *Ferber*, 458 U.S. at 764, 102 S.Ct. 3348. Moreover, any literary, scientific, artistic, or educational value of the work is viewed as de minimis, if not irrelevant, because of the State's overriding interest in protecting children. *Id.* at 762, 102 S.Ct. 3348; *see also id.* at 774–75, 102 S.Ct. 3348 (O'Connor, J. concurring). The State reasons that pretrial constitutional scrutiny by the district court is unnecessary under this standard so long as the visual material arguably falls within the statutory definition because constitutional free speech provisions are irrelevant.

{54} In contrast, Defendants urge us to apply the *Miller* obscenity standard as modified by *Fawcett*, 114 N.M. at 548 n. 7, 843 P.2d at 850 n. 7. In *Fawcett*, we held the New Mexico Constitution protects more speech than the First Amendment, and we therefore chose to apply a community "tolerance" standard, rather than the community "acceptance" standard articulated in *Miller*. *Fawcett*, 114 N.M. at 547, 843 P.2d at 849. In the same vein, Defendants assert that the Cave Shoot Photos cannot be deemed obscene on their face. Defendants base their argument largely on the extensive and essentially undisputed evidence they presented regarding artistic value—a prong we have held is particularly well-suited for determination by the courts. *See id* at 549, 843 P.2d at 851 (discussing appellate court's role).

**Federal Constitution**

{55} *Ferber* was the first United States Supreme Court case to consider child pornography. There, the owner of an adult bookstore appealed his conviction under a New York child pornography statute for selling films that primarily depicted young boys masturbating. *Ferber*, 458 U.S. at 751–52, 102 S.Ct. 3348. The defendant challenged the constitutionality of the statute because it did not require proof of obscenity. The Court held that under the First Amendment, photographs of children need not be obscene to be prohibited, so long as the standards used to define the category of banned speech were suitably narrow and an element of scienter was included. *Id.* at 764–65, 102 S.Ct. 3348. The Court recognized that some states might find that the *Miller* test properly accommodates their interest in protecting the welfare of children. *Ferber*, 458 U.S. at 760–61, 102 S.Ct. 3348.

{56} *Ferber* also recognized that even an otherwise constitutional child pornography statute may reach protected speech, but determined that "whatever overbreadth may exist. should be cured through case-by-case analysis of the fact situations to which its sanctions ... may not be applied." *Id.* at 773, 102 S.Ct. 3348 (internal quotation marks and citation omitted). In this respect, *Ferber* "reaffirmed that where the speech is neither obscene nor the product of sexual abuse, it does not fall outside the protection of the First Amendment." *Ashcroft*, 122 S.Ct. at 1402 (" '[D]epictions of sexual conduct, not otherwise obscene, which do not involve live performance or photographic or other visual reproduction of live performances, retains First Amendment protection.' ") (quoting *Ferber*, 458 U.S. at 764–65, 102 S.Ct. 3348).

{57} We will not conduct a *Ferber* analysis here, however, because we reject the State's position that the Act is a *Ferber* statute. We base our rejection both on the fact that we have interpreted our state constitution to provide broader protection than the First Amendment and on the history of the Act. The history of the Act, as we have recited above, demonstrates that the legislature has consistently used wording derived from the *Miller* formula. Conversely, the legislature has not taken any steps to broaden the Act as *Ferber* would allow under the federal constitution. The progressive refinement of the Act indicates the legislature intended that the Act applied subject to an obscenity standard. The legislature's adoption of an express and defined obscenity standard in the current version of the Act supports our judgment in this regard. Eval-

uating the Act under the New Mexico constitution, we hold the Act is governed by an obscenity standard. *See State v. Nunez*, 2000–NMSC–013, ¶¶ 14–15, 129 N.M. 63, 2 P.3d 264 (reaffirming interstitial approach used in New Mexico such that only if the right being asserted is not protected by the federal constitution does the court analyze whether the right is protected by the state constitution).

### State Constitution

{58} We turn next to consider whether New Mexico's constitution requires application of the *Fawcett* obscenity standard to the Act. Article II, § 17 of the New Mexico Constitution provides: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right . . . ." While "applicable precedents have determined that the protection of the federal and state constitutions are the same, at least with respect to content-neutral restrictions[,]" *State v. Ongley*, 118 N.M. 431, 432, 882 P.2d 22, 23 (Ct.App. 1994), *modified on other grounds by State v. Gomez*, 1997–NMSC–006, ¶ 32, 122 N.M. 777, 932 P.2d 1; *Stuckey's Stores, Inc. v. O'Cheskey*, 93 N.M. 312, 318, 600 P.2d 258, 264 (1979), this Court has interpreted our state constitution more broadly than the federal constitution with respect to content-based restrictions. *Fawcett*, 114 N.M. at 547, 843 P.2d at 849.

■ {59} Under the second prong of the *Miller* test, patent offensiveness is determined by what is "accepted" by the community as a whole. *Fawcett*, 114 N.M. at 546, 843 P.2d at 848. In *Fawcett*, we observed that " '[a]cceptance' is really the lowest common denominator, and may well limit dialogue on significant public issues beyond obscenity." *Id.* We also opined that the average person would probably find most obscene speech unacceptable, even though it is constitutionally protected. *Id.* We concluded that our state constitution required the community to find the material "intolerable" before it was deemed an abuse of speech. *Id.* In particular, we held that contemporary community standards should be judged by whether the average person or community

would be tolerant of the materials in the possession of another, even though most members of the community might themselves be offended. *Id.* We observed that, "the tolerance standard better protects freedom of expression, and is the *only* standard which can truly satisfy article II, Section 17 of the New Mexico Constitution." *Id.* at 547, 843 P.2d at 849 (emphasis added) (internal quotation marks and citation omitted). "In order to be constitutionally sufficient, the definition of 'patently offensive' must incorporate a standard which protects all but the most insufferable of sexually explicit material." *Id.* (internal quotation marks and citation omitted). Community tolerance thus determines whether the material is patently offensive. *Id.*

{60} Whether to apply the *Fawcett* intolerable standard to the Act presents a difficult and delicate question. The State correctly points out that the obscenity standard adopted in *Fawcett* is an adult pornography standard. The State's interest in protecting innocent children from sexual exploitation is far more compelling than its interest in protecting consenting adults. As noted above, the legislature has now incorporated the *Miller* test for obscenity in the Act. Section 30–6A–3(E). The legislature, however, did not define the appropriate "community standard."

■ {61} As *Ferber* held, the decision of how to regulate child pornography is a policy decision that is left to the states and limited only by the requirements of adequate notice. All right-thinking persons would agree that the "sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people." *Ashcroft*, 122 S.Ct. at 1399. With this in mind, we are confident that the community tolerance aspect of *Fawcett* will self-adjust to take the interests of children into appropriate account. What the community finds tolerable for adults will be a far cry from what it will tolerate when visual materials include children. Thus, we believe that *Fawcett*'s intolerance standard provides a workable model for patent offensiveness under the Act. The *Fawcett* obscenity standard appropriately ensures the state's interest in protecting chil-

dren from abuse is satisfied while at the same time remaining sensitive to our free expression values. Rather than isolate the 1993 version of the Act, we hold that the 1993 Act under which Defendants were prosecuted must be applied subject to a *Fawcett* obscenity standard.

### Constitutional Gate–Keeping Role

{62} Having found the *Miller/Fawcett* obscenity standard applies to the Act, we must next address the nature and scope of the district court's role as a constitutional gate-keeper to determine whether the court's ultimate decision was proper in this case. In addressing the appellate standard of review to be applied in obscenity cases, the *Fawcett* Court recognized that "the first two prongs of the three-prong test are primarily factual issues to be judged by contemporary community standards," applying an intolerable standard. *Fawcett*, 114 N.M. at 548, 843 P.2d at 850. What is patently offensive is measured by what conduct is specifically defined under the statute. *Id.* at 548 n. 7, 843 P.2d at 850 n. 7. However, we also noted that courts have "at least equal expertise and authority" to determine whether material has serious value under the third prong. *Id.* at 549, 843 P.2d at 851. Thus, *Fawcett* holds that appellate courts must conduct an independent review, giving some deference to the jury's findings on the prurient interest and patently offensive prongs, but not on the "value" prong. The ultimate question to "be asked is not whether the materials are obscene, but whether the materials create a jury issue as to obscenity." *Id.* (internal quotation marks and citation omitted).

{63} The *Fawcett* formulation provides guidance as to the district court's standard of review as gate-keeper. The district court may entertain a pretrial motion—or a motion for directed verdict—addressing all three prongs, but it must keep in mind the inherently factual nature of the inquiry involved in the questions. As to both inquiries, the district court must satisfy itself that no reasonable juror could find beyond a reasonable doubt that the material, taken as a whole, appeals to prurient interests or is patently offensive. The *Dost* factors may be employed in making the determination.

{64} To withdraw the third *Miller* prong from the jury, the trial court must be able to say that no rational juror could conclude beyond a reasonable doubt that the material, taken as a whole, lacks serious artistic, scientific, political, or other social value. *See* Schauer, *supra* at 150. The value of a work of art is based on a national standard and does not vary between communities. *Fawcett*, 114 N.M. at 549, 843 P.2d at 851. For a work to have artistic value, "there must be the presence of an 'idea' as a predominant part of the work, not necessarily in terms of underlying purpose." Schauer, *supra* at 145. Given the inherent difficulties of such an evaluation, and to assist the trial court in determining a national standard of artistic, scientific, political, or other social value, expert testimony is admissible in support of or in opposition to a motion to dismiss. However, if it appears that this issue will lead to a "battle of experts," the district court should reserve the issue for determination at trial.

{65} We find one federal case particularly helpful in illustrating how an obscenity standard would be applied to photographs of naked children. In *Various Articles of Merchandise*, the owner of a bookstore was charged under federal obscenity law for importing adult nudist magazines which contained numerous photographs of nude children. 230 F.3d at 651. Applying a *Miller* obscenity standard, the court found the photographs of "[c]hildren ... swimming, boating, exercising, playing with beach balls, having picnics, swinging on jungle gyms, building sand castles, riding bicycles, playing guitar, riding horses, and playing such sports," primarily focused on children's activities, not on the children's bodies. *Various Articles of Merch.*, 230 F.3d at 655. Although the court held that the first two prongs are primarily factual, the appellate court conducted an independent review of the photographs on their face, finding they lacked any indicia of prurient appeal or patent offensiveness. The circuit court found that photographs of nudist children engaged in typical childhood activities did not satisfy

762

the prurient interest prong of *Miller*. *Various Articles of Merch.*, 230 F.3d at 655. The circuit court then looked at the photographs to determine whether they depicted a "lewd exhibition of the genitals" which was prohibited by law. The court found that many of the photos did not depict genitalia at all and those that did, did not "exhibit" or "show off" the genitals, the exposure of genitalia was only incidental to the children being naked. *Id.* at 656–57. Rather than the hard core sexual conduct required for photographs to be patently offensive, the court found none could be deemed lewd by any standard—the children were smiling, happy, playful, and not posed in a way suggestive of moral looseness. *Id.* at 657. The only unusual aspect was that the children were nude and "nudity alone is not enough to make material legally obscene under … *Miller.*" *Id.* (quoting *Jenkins,* 418 U.S. at 161, 94 S.Ct. 2750).

## IV. Propriety of District Court Ruling [1]

### Standard of Review

{66} In *Fawcett* we held that an independent review of the record for substantial evidence was appropriate in obscenity cases on appeal after trial. 114 N.M. at 549, 843 P.2d at 851. However, in pretrial rulings such as we have here, the question is whether the material depicts conduct that cannot be considered obscene as a matter of statutory or constitutional law. We, therefore, review the photographs de novo under the guidelines articulated above.

### Family Photos

{67} The district court issued the following conclusions of law:

C. The "family photos" shown to the Santa Fe and Rio Arriba Grand Juries are fundamentally private family photos. The "family photos" are not lewd in that they merely capture uninhibited moments of adolescent spontaneity. The family photos were not made for the purpose of sexual stimulation.

D. The "family photos" represent protected expression under the New Mexico Constitution. N.M. Const. Art II, Section 17.

E. The State lacks a legitimate interest in [proscribing] Defendant Rendleman's conduct in creating the images reflected in the "family photos" in that the photographs represent the mere private possession of innocuous photographs of naked children.

F. The "family photos" were a legitimate effort by a parental figure, someone who was also an artist, to document the activity and development of his children.

The court based its conclusions, in part, on the photos themselves noting:

The "family photos" are all clearly spontaneous with the children many times laughing and smiling and apparently under no direction to pose for the photos. The photos also appear to be an attempt to chronicle the different events such as the children playing in the river, playing with a snake, bathing, and playing make believe games, e.g. pretending to be dogs…. The "family photos" do not involve real, simulated, or suggested sexual activity or evidence of intent to produce sexual activity.

{68} The Rio Arriba County Grand Jury charged Rendleman with three counts of sexual exploitation of the children in 1996 (counts 18–20), three counts of sexual exploitation of the children in 1997 (counts 21–23), two counts of sexual exploitation of the girl in 1998 (counts 24 and 25), and two counts of sexual exploitation of the girl in 1999 (counts 29 and 30). Counts 24 and 25 are based on grand jury exhibits 33–46, and counts 29 and 30 are based on grand jury exhibits 47–50. The grand jury also charged Barbosa with two counts of sexual exploitation of the girl in 1998 (counts 18 and 19) based on grand jury exhibits 33–46.

■ {69} The district court found that counts 18–23 were based on testimony presented to the Rio Arriba Grand Jury that Rendleman had videotaped the children nude during the summers of 1996 and 1997.

1. A matrix relating grand jury exhibits to charged counts, plus the district court's ruling is attached as Addendum A.

Counts 18–23 were ultimately dismissed because of the trial court's categorizing the videos as "family photos." On appeal, the parties do not discuss the videotapes that form the basis of counts 18–23 in their briefs, nor do they cite to anywhere in the record where such evidence has been identified, let alone considered by the district court at the hearing on the motion to dismiss. Because of the limited record before us, we cannot determine whether the material that forms the basis of counts 18–23 meets statutory and constitutional standards. Consistent with our decision that each count must be analyzed in terms of the content of the depiction charged, we conclude that the district court erred dismissing counts 18–23 on the ground that they involved "family photos." Accordingly, we reverse the dismissal of counts 18–23 and remand this matter to the district court for reconsideration of these charges in accordance with the standards outlined in this opinion.

■ {70} Grand jury exhibits 33–46 consist of fourteen "family" photos which form the basis of six counts of sexual exploitation of the girl against Rendleman and six counts of sexual exploitation against Barbosa, although there is no break down as to which photos correlate to the specific counts. Exhibits 33–36 are four pictures of the girl, fully clothed, playing with a snake as it crawls out of her pants. In one photo, the girl is touching the snake with her index finger as if she is guiding it out; in another, the boy, who is laughing, grabs it. Although there is sexual innuendo with the snake crawling out of the girl's fly, there is no suggestion of "simulated" sexual behavior, the photos were taken in a nonsexual setting—the livingroom, and the children do not appear posed but are instead playing. Having failed to meet statutory requirements, we find these photos must be dismissed as a matter of law and affirm the court's decision to dismiss any related counts of sexual exploitation.

■ {71} The remaining ten exhibits, 37–46, depict the girl playing with Rendleman's daughter and the boy. Exhibit 38 is a side shot of the girl crawling on the livingroom floor and contains absolutely no visible display of her genitalia or pubic area. Similarly, exhibit 43 is a side shot of the girl crawling over Rendleman's daughter to get a bean bag chair. Both girls are naked in the living room, but no genitalia or pubic area is visible. In seven other photos, the girl and Rendleman's daughter are playing naked on the kitchen counter. The girl's groin area is not visible in exhibits 37, 40, 44, and 45. Rather, she is playing with Rendleman's daughter, holding a dollar bill over her mouth, or kneeling beside his daughter and the boy who has a hat on his head and is fully clothed. In exhibit 42, the girl is kneeling on the counter, her genitalia are just barely visible, and she turns her head to the camera with an open mouthed laugh. Rendleman's daughter is beside her, naked except for a hat pulled over her face, and the boy is in the foreground, fully clothed and smiling. The girl is not even in photo 41.

■ {72} The only two photos where the girls' genitalia are arguably the focus of the camera are exhibits 39 and 46. Exhibit 39 depicts Rendleman's daughter and the girl on their hands and knees on the kitchen counter. The shot is from behind; the girl is looking ahead, while the daughter turns laughing at the camera. In exhibit 46, the girl and Rendleman's daughter are standing on the kitchen counter naked, bent over with their faces full of laughter between their knees facing the camera. Their genitalia are fully exposed and appears to be the central focus of both photos.

{73} Under a statutory analysis, we find exhibits 37–38 and 40–45 do not raise a jury question on the issue of sexual exploitation in that they fail to meet minimal statutory standards. We find exhibits 39 and 46 fall within the statute. Under a constitutional analysis, when viewed as a whole, the dominant theme of the Family Photos is the documentation of adolescent spontaneity. Even in this context, however, given the unusual focus on the girls' genitalia in exhibits 39 and 46, a reasonable juror could find these two photos were intended to appeal to prurient interests or that they are patently offensive.

■ {74} The State's evidence that five of the fourteen photos could be sexually stimulating to a pedophile fails to raise a disputed

issue of fact. Under an objective standard, the subjective response of a pedophile is not relevant to a determination of sexual purpose. Moreover, the standard is measured by the reasonable person, not the reasonable pedophile. Accordingly, we affirm the district court's ruling that any charges of sexual exploitation that are based on exhibits 37–38 and 40–45 must be dismissed. We reverse that decision with respect to any charges of sexual exploitation that are based on exhibits 39 and 46.

{75} Grand jury exhibits 47–50 consist of three pictures of the girl playing at the river and one picture of her standing at a coffee table with her underpants pulled down, partially exposing her buttocks to the camera. In the river shots the girl is covered in mud, either sitting in a raft, which is also covered in mud, or standing next to the river playing with the mud. Her genitalia and pubic area are not visible in any of these photos, and in one, it appears she is wearing underpants, although the mud distorts the photo substantially. As such, we find these photos fail to meet statutory criteria and must be dismissed as a matter of law. Accordingly, the dismissal of counts 29 and 30 as to Rendleman are affirmed.

{76} The Santa Fe County grand jury charged Rendleman with one count of sexual exploitation of his daughter in 1996 based on grand jury exhibits 1–6. In exhibits 3 and 5, she is shown standing in a bubble bath, wearing nothing but a giant pair of green, plastic sunglasses. Her pubic area, while visible, is clearly not the focus of this photo. Exhibits 3 and 5, therefore, fail to raise a jury question on the issue of sexual exploitation and must be dismissed as a matter of law.

{77} The remaining four photos are, in fact, two sets of duplicates. Exhibits 1 and 6 are duplicate pictures of Rendleman's daughter crawling on her bedroom floor. The shot is taken from behind, her legs are spread and genitalia are visible, if not the focus of the picture. Exhibits 2 and 4 are duplicate pictures of his daughter, leaning back on her bed, grabbing her feet. She is wearing only socks and her genitalia are

visible if not the focus of the photo. Both sets of pictures raise an issue as to purpose and the predominant theme is not readily apparent on the face of these photos, perhaps because they are taken out of context. Accordingly, we reverse the district court's decision dismissing these photos. Of course, Rendleman can introduce any and all photos that were taken in this series to establish his defense.

### Cave Shoot Photos

{78} The district court refused to dismiss counts 1–3 and 12–14, as to Rendleman, and counts 1–6, as to Barbosa. Both indictments alleged three counts of the sexual exploitation of the girl and three counts of the sexual exploitation of the boy based on grand jury exhibits 12–32. In refusing to dismiss the Cave Shoot Photos, the district court issued the following conclusions of law:

G. The material contained in the "cave shoot photos" presents a factual issue as to whether these photographs have serious artistic value or not, and/or whether or not they are patently offensive or of prurient interest according to prevailing community standards.

H. Where serious questions of fact exist, they cannot be decided on constitutional grounds alone. The "cave shoot photographs" raise fact issues concerning the purpose or reasons why these photos were created and will turn on the issue of credibility and, therefore, should be decided by a jury. *City of Cincinnati v. Contemporary Arts Center*, 57 Ohio Misc.2d 9,15, 566 N.E.2d 207 (1990).

I. The "cave shoot photographs" may meet the statutory requirement of NMSA 30–6A–2 . . . .

{79} Initially, we note that exhibits 30–32 were taken outside the cave, and bear no resemblance to the Cave Shoot Photos, in general. Exhibits 31 and 32 are photos of Barbosa (we assume) with the girl and boy. Both children are naked and covered in mud, while Barbosa is partially clothed in a skirt and her breasts are covered in mud. One shot is taken from the front and the second is taken from behind. The third photo, exhibit 30, we assume is a depiction of the two

children, although only their naked buttocks are shown, covered in mud. None of these photos focus on the genitalia or pubic area; in fact, the area is barely visible, if at all. Having failed to meet the "focus" element, any related charges upon which these photos are based must be dismissed as a matter of law.

{80} The remaining photos, exhibits 12–29, present particularly difficult questions. The first problem we perceive is that there are twenty-nine Cave Shoot Photos before us. Eleven of these, exhibits 1–11, were charged as criminal sexual contact, whereas the other eighteen, exhibits 12–29 were charged as sexual exploitation. Thus, the photos that are charged as sexual exploitation are isolated from the work as a whole. The second problem is that at least eleven of the eighteen photos (exhibits 12–18, 20, and 27–29) do not depict or focus on the groin area. In this respect, the district court erred in concluding that these photos "may meet statutory requirements." These photos cannot form the basis of any charges, and accordingly, any counts that rely solely on these exhibits to support a charge of sexual exploitation should be dismissed. To the extent genitalia or pubic area are displayed in the remaining seven photos, the judge should have considered all of the Cave Shoot Photos as a complete "work," including the photos that constitute the criminal sexual contact charges, as well as the twelve photos we reject above.

{81} Defendants argue that the photos were consistent with their overall theme of primitivism that were part of the artistic process used to create sculptures for the cave. One of their experts testified on the use of the human form in photography, the artistic process, and the similarity of the Cave Shoot Photos to widely disseminated commercial publications. She opined that the themes in Rendleman's artwork reflected an interest in natural forms and the connection between organic and inorganic forms. The photos reflected this theme and, in particular, the totem and throne images appeared to be a model or study for ongoing works of art in the cave. Defendants' other witness, an expert in contemporary art histo-

ry, studio practice, and artistic expression, further opined that the photos were related to the sculptural elements of the cave. The State's evidence was limited to the photos themselves and its expert's testimony that a pedophile might be stimulated by six of these twenty-nine photographs. As we noted above, his testimony is of limited, if any, value in this context in that he was unable to testify regarding Defendants' purpose in creating any of these images.

{82} We find that the predominant theme of primitivism and connection between organic and inorganic form is reflected in the Cave Shoot Photos, and that many of these photos appear to be models or studies for ongoing works of art in the cave. Others appear to be spontaneous shots of the children playing like cave people, digging in the dirt, climbing the cave walls, playing dead, and playing with a bear, each of which is related to the overall theme of primitivism. Only one picture of the girl (Exhibit 8), covered in oil, lying back on a metallic sheet of sorts, is clearly posed. This photo was charged as a criminal sexual contact. Despite their context, however, we cannot say that the seven photos that remain before us must be dismissed as a matter of constitutional law. Six of these photos, exhibits 19 and 22–26, depict the children playing but in each of these photos their genitalia is fully exposed, if not "exhibited." The seventh photo, exhibit 21, is a "throne" photo showing the girl as part of the "seat" with her legs spread and facing the camera. Given the questionable focus of these photos, a rational juror might find they were designed to appeal to prurient interests or that they are patently offensive and that the other photos were merely a pretext or cover for obscene material. We, therefore, reverse the district court judgment refusing to dismiss the Cave Shoot Photos to the extent that exhibits 12–18, 20, and 27–32 were relied on to sustain charges of sexual exploitation. We affirm the decision to prosecute charges of sexual exploitation with respect to exhibits 19 and 21–26.

{83} To summarize, we affirm the ruling of the district court dismissing the Rio Arriba indictment with respect to sexual exploita-

tion counts 24, 25, 29, 30 against Rendleman and sexual exploitation counts 18 and 19 against Barbosa, except as to any counts that rely on exhibits 39 and 46. As to counts 18–23, we reverse the dismissal of all counts charging sexual exploitation by videotaping the children and remand to the district court for reconsideration. .

{84} As a final note, we assume that counts 26–27 were otherwise disposed of since the amended decision of the district court did not discuss these counts. In the event that these counts were overlooked, the district court may review these counts consistent with this opinion.

{85} We reverse in part the district court's decision to deny the motion to dismiss the Rio Arriba indictment with respect to counts 1–3 and 12–14 against Rendleman and counts 1–6 against Barbosa and hereby dismiss those counts to the extent that they rely on exhibits 12–18 and 27–32. We affirm the court's decision as to any remaining counts that rely on exhibits 19 and 21–26. We also reverse the dismissal of Santa Fe County indictment, count 1 against Rendleman, but affirm the court's decision to reject grand jury exhibits 3 and 5 as a matter of law. As noted above, Rendleman can introduce any and all photos taken during this "session" in aid of his defense so that the court or jury may consider the material as a whole.

## V. Criminal Sexual Contact of a Minor and Child Abuse

{86} The district court dismissed both counts of child abuse of the boy against Rendleman (count 28) and Barbosa (count 20). According to the court, these counts were based on Family Photos, exhibits 37–46, in which the fully clothed boy was present with the girl and Rendleman's daughter who were naked. The court found that Barbosa was responsible for the children at this time, gave Rendleman permission to take these photos, and was present in one photo in which the girl and his daughter were being photographed nude.

{87} The district court refused to dismiss eight counts of criminal sexual contact of the girl and three counts of criminal sexual contact of the boy. These counts were based on the Cave Shoot Photos, exhibits 1–11, in which Rendleman is shown in various poses with the children, primarily the totem pole and throne poses, in which their genitalia touches Rendleman. According to the district court, there was testimony that the oil used to cover the girl in the remaining two photos was applied by Rendleman.

{88} Neither party has argued or briefed these issues on appeal. We, therefore, deem them to be abandoned. See Fleming, 1999–NMCA–149, ¶ 3, 128 N.M. 295, 992 P.2d 308. To the extent Rendleman asserts, without reference to any authority, that the touching was merely incidental to protected First Amendment expression, that is not our understanding of the law. States have greater leeway to regulate physical conduct than to suppress depictions or descriptions of the same behavior. Miller, 413 U.S. at 26 n. 8, 93 S.Ct. 2607. The regulation of conduct which embodies both speech and nonspeech elements is justified, so long as they are unrelated to the suppression of free speech and the least restrictive means available. United States v. O'Brien, 391 U.S. 367, 376–77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Accordingly we affirm the district court decision with respect to Rendleman, counts 4–11, 15–17, and 28 and with respect to Barbosa, counts 7–17 and 20.

## CONCLUSION

{89} This matter is remanded to the district court for further proceedings not inconsistent herewith.

{90} **IT IS SO ORDERED.**

ALARID and PICKARD, JJ., concur.