2001-NMCA-058

30 P.3d 376

**In the Matter of JADE G., a Child.**

**No. 21,330.**

Court of Appeals of New Mexico.

May 24, 2001.

Certiorari Granted, No. 25,994, Aug. 13, 2001.

688

Patricia A. Madrid, Attorney General, Joel Jacobsen, Assistant Attorney General, Santa Fe, NM, for Appellant.

Phyllis H. Subin, Chief Public Defender, Jennifer R. Albright, Assistant Appellate Defender, Santa Fe, NM, for Appellee.

*OPINION*

WECHSLER, Judge.

{1} The State appeals from the children's court's order dismissing the delinquency petition against Jade G. (Child). The petition charged Child with first degree murder for the death of her father, Samuel G. We reverse the children's court's dismissal.

*Facts*

{2} On the morning of June 14, 1999, Bertha G., Child's mother, called 911 to report that her husband had been accidentally

shot. Detective Hall testified at the hearing on the motion to dismiss that the police officers who responded to the call originally treated the shooting as an accident. When questioned initially about the shooting, the family members gave police similar statements as to the accidental nature of the shooting. Despite the family's statements, Sergeant Duran had suspicions that the shooting occurred while Child's father was asleep. As a result, violent crime investigators were called to the scene. Detective Hall, the lead investigator, testified at the hearing on the motion to dismiss that because of inconsistencies between the statements of the family and the position of the body at the time police arrived, along with the forensic evidence of the gunshot wound, the police thereafter treated the investigation as a homicide.

{3} On March 8, 2000, the children's court held a hearing on Child's motion to dismiss for police misconduct. Child offered the testimony of Detectives Hall and Dilley, as well as a transcript of a taped encounter between Child and the detectives, as evidence of extreme police misconduct.

{4} During his testimony, Detective Hall acknowledged that he and other police officers used extreme investigative tactics during their investigation of Child's father's death. For instance, Detective Hall acknowledged that police installed a listening device in Child's residence by a ruse which included a police officer posing as a burglar, a SWAT team to apprehend the burglar, and the evacuation of several residences near Child's home. Detective Hall stated that a judge had entered an order approving the use of the listening device and the installation of the device surreptitiously or by ruse. Another investigative tactic utilized by the police involved pulling over the vehicle driven by a visitor to Child's home. Officers stopped the vehicle without reasonable suspicion to do so and told the driver and her daughter that they had been seen running other motorists off the road. Detective Hall acknowledged that the story told to the driver was a pretense to stop the vehicle and obtain the driver's name.

{5} Detective Hall also admitted to directing another officer to write a false note stating, "B, they know what you did and about all the money. Good luck." Detective Hall stated that this note was left on the door of Child's residence in an effort to incite conversation which might be heard through the wiretap.

{6} This appeal is particularly concerned, however, with the conduct of Detectives Hall and Dilley during the early morning hours of August 7, 1999. According to both detectives' testimony, they became aware on August 6 that Child and her mother were moving out of their residence because they were facing foreclosure. The detectives became concerned that if the family moved, they would not be able to locate Child or her mother. Based on this fear, the detectives sought an arrest warrant for Child on the evening of August 6.

{7} According to Detective Dilley, preparation of the affidavit for an arrest warrant did not begin until 5:00 p.m. on August 6. A judge signed the arrest warrant at approximately 11:55 p.m. and granted an order sealing certain portions of the affidavit at about 12:29 a.m. on August 7.

{8} The two detectives delivered the arrest warrant for Child at approximately 1:25 a.m. on August 7. Child was twelve years old at the time. Both Detectives Hall and Dilley testified that they did not immediately deliver Child to a detention center. Instead, after arresting Child, the detectives drove to the parking lot of a police substation and interrogated Child for at least 45 minutes. Child was processed into a detention center at about 3:00 a.m. The detectives tape recorded the encounter from the time they arrived at Child's house to arrest her until they gave up the interrogation.

{9} According to Detective Dilley's testimony, police department staff originally transcribed the tape, and he and Detective Hall made hand-written corrections to the transcription. The transcript indicates that Detectives Hall and Dilley failed to advise Child of her rights to an attorney and to remain silent. Both detectives admitted that they failed to inform Child of her rights. However, neither detective could state with preci-

sion the reason why they did not advise Child of her rights when they began the interview.

{10} Detective Hall testified that after consulting with the children's court attorney, he understood that he and Dilley could interview Child, but that anything she said could not be admitted against her. Detective Hall explained that he did not understand his failure to inform Child of her rights to have any impact on Child, because her statements would be suppressed regardless of whether they read Child her rights. When asked whether he thought that his interrogation of Child was illegal, Detective Hall stated, "[W]e had gone through [the children's court attorney] on that and after we heard that that portion of it, . . . we should go forth with that avenue. And we did that, yes." Detective Hall stated that although he knew Child's statements under these circumstances were inadmissible, he and Detective Dilley were seeking to obtain statements that implicated other people in a conspiracy to commit murder. The testimony indicates that Child's mother was a suspect at the time of the interrogation and was still a suspect at the time of the hearing.

{11} According to the handwritten notes made by Detective Hall on the transcript of the tape, Child made reference to her attorney and to her mother on more than one occasion. When asked whether they believed Child had invoked her right to counsel, the detectives did not readily admit that Child's questions about counsel were invocations of her right to counsel. The testimony indicates that both detectives knew Child was represented by an attorney. Detective Hall stated that even if he had interpreted her queries about her attorney as invocations of her right to counsel, such fact was of no consequence because he was not seeking to obtain statements that could be used against Child.

{12} The children's court granted Child's motion to dismiss. On May 9, 2000, the court entered findings of fact and conclusions of law in support of its order. The court concluded that the officers' failure to give *Miranda* warnings, *see Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and to provide Child with contact

with her Mother, was an intentional violation of Child's constitutional rights and her rights under the Children's Code and, thus, an unlawful extension of police power. NMSA 1978, § 32A-2-14 (1993). The court also relied on the outrageous government conduct and entrapment doctrines to provide the basis for the court's power to dismiss the petition. *State v. Vallejos,* 1997-NMSC-040, ¶ 20, 123 N.M. 739, 945 P.2d 957; *State v. Sheetz,* 113 N.M. 324, 329, 825 P.2d 614, 619 (Ct.App.1991); *United States v. Harris,* 997 F.2d 812, 815–16 (10th Cir.1993); *United States v. Mosley,* 965 F.2d 906, 910 (10th Cir.1992). In addition, the children's court relied upon its discretion and supervisory powers as supportive of its ability to dismiss the petition against Child.

{13} We do not view the authorities relied upon by the children's court as empowering the court to dismiss the delinquency petition in this case. We therefore reverse the children's court's order.

*The Children's Code*

 {14} We first analyze whether the Children's Code provides the children's court with the power to dismiss a delinquency petition for police misconduct. The basic rights provision of the Children's Code bestows special statutory rights upon children subject to the Delinquency Act. Section 32A-2-14(A). In some instances, these rights may be broader than the rights of an adult. *Compare Miranda,* 384 U.S. at 444–45, 86 S.Ct. 1602 *and United States v. Snow,* 82 F.3d 935, 942–43 (10th Cir.1996) (stating that fingerprinting is non-testimonial in nature and thus does not require *Miranda* warning protection as no constitutional right not to be fingerprinted exists), *with* Section 32A-2-14(C), (F), (G), (I) (establishing, for example, rebuttable presumption of inadmissibility for confessions or statements by thirteen year old to person in authority and necessity of court order before fingerprinting or photographing child under thirteen years of age).

{15} We agree that the conduct of the police, in particular the middle-of-the-night interrogation of Child, raises questions under the Children's Code. Section 32A-2-14(F) would have required the children's court to

exclude any statements obtained from Child by the police during that interrogation. Detectives Hall and Dilley testified that they understood that all of Child's statements would be excluded and they relied upon this provision to justify the fact that they did not advise Child of her *Miranda* rights or provide her with access to her mother or her attorney. The question remains, however, whether any potential violation of this provision or any other provision of Section 32A–2–14 permits the children's court to dismiss a delinquency petition.

■ {16} In pursuing this question of construction of the Children's Code, we look initially to the plain language of the Code to ascertain legislative intent. *State v. Pearson*, 2000–NMCA–102, ¶ 5, 129 N.M. 762, 13 P.3d 980 (stating that the primary purpose of statutory construction is to give effect to legislative intent through the plain meaning of the words used by the legislature). Section 32A–2–14 itself does not provide for the remedy of dismissal for a violation of its provisions. Thus, the plain meaning of Section 32A–2–14 does not lead to a conclusion that the Code contemplates dismissal. *Id.* Neither does our review of the other provisions of the Children's Code lead to a discovery of a legislative endorsement of dismissal as a remedy for a violation of the Code. Quite simply, a plain reading of the Code fails to unearth a delegation of power to the children's court sufficient to encompass the dismissal of a delinquency petition based on a violation of any of the statutory rights granted under Section 32A–2–14. *Id.*

■ {17} Unaided by the plain meaning of the Code, our next step in giving effect to legislative intent is to look to the legislative purposes of the Children's Code for any indication of the legislature's intent to provide the children's court with the power to utilize the extreme remedy of dismissal in a criminal case. *State v. Jonathan M.*, 109 N.M. 789, 790, 791 P.2d 64, 65 (1990) (stating that the Children's Code should be read in light of its legislative purposes); *State v. Andrews*, 1997–NMCA–017, ¶ 5, 123 N.M. 95, 934 P.2d 289 (stating that legislative intent is derived first from the language of a statute and then from its legislative purpose). We look to the legislative purpose so that we can "effectuate the purpose and object of the underlying statutes." *State v. Johnson*, 2001–NMSC–001, ¶ 6, 130 N.M. 6, 15 P.3d 1233.

{18} The purpose section of the Children's Code provides:

The Children's Code ... shall be interpreted and construed to effectuate the following legislative purposes:

. . . .

B. [T]o provide judicial and other procedures through which the provisions of the Children's Code are executed and enforced and in which the parties are assured a fair hearing and their constitutional and other legal rights are recognized and enforced.

NMSA 1978, § 32A–1–3 (1999).

{19} Section 32A–1–3, through its plain language, instructs the courts to interpret and construe the Children's Code to provide procedures which execute and enforce the Code. However, the plain language utilized in the statement of legislative purpose does not grant any additional power to the children's court to fashion remedies not provided within the Code. *Pearson*, 2000–NMCA–102, ¶ 5, 129 N.M. 762, 13 P.3d 980 (stating that the words of a statute must be given their plain meaning). Instead, this section is an instruction to interpret the Code to provide procedures for fair hearings and enforcement of rights. If the portions of the Children's Code applicable to this case included a provision addressing a procedure for the enforcement of Child's rights in this case, we could apply this stated purpose of the Code to such provision and interpret it accordingly. However, the Children's Code does not contain a provision that allows the children's court to dismiss a delinquency petition to remedy a violation of the Code's requirements for interrogating children. The purpose provision of the Code and its vague references to enforcement are not sufficiently clear to support a conclusion that the Code contemplated the remedy of dismissal.

■ {20} Therefore, by reading the plain language of the Children's Code, we conclude that neither the substantive provisions nor the purposes of the Code provide the chil-

dren's court with the power to dismiss a delinquency petition under the circumstances of this case. *See Andrews,* 1997–NMCA–017, ¶ 5, 123 N.M. 95, 934 P.2d 289 (stating that legislative intent is discerned through the plain meaning of the words of a statute). Dismissal is an extreme remedy, reserved for extraordinary circumstances. *Cf. Mathis v. State,* 112 N.M. 744, 747, 819 P.2d 1302, 1305 (1991) (holding that dismissal for discovery violations was an extreme remedy, but warranted under the facts of the case). We believe that the legislature would have clearly provided for such a significant and extreme remedy in the Children's Code if it had intended the children's court to possess such power. We decline to read it into the Code.

*Entrapment or Outrageous Government Conduct*

{21} The children's court cited various cases in its order dismissing the petition against Child that describe governmental conduct in terms of the defenses of entrapment and outrageous government conduct. *Vallejos,* 1997–NMSC–040, ¶ 20, 123 N.M. 739, 945 P.2d 957; *State v. Buendia,* 1996–NMCA–027, 121 N.M. 408, 410, 912 P.2d 284, 286; *Sheetz,* 113 N.M. at 329, 825 P.2d at 619; *Harris,* 997 F.2d at 815–16; *Mosley,* 965 F.2d at 910. As discussed in the cases cited by the children's court, the doctrines of entrapment and outrageous government conduct, however, are distinct from the present case in a fundamental sense. Those doctrines generally consider whether the police conduct at issue induced or helped a person to commit a crime, or whether the police essentially manufactured a crime. UJI 14–5160 and 14–5161 NMRA 2001; *Vallejos,* 1997–NMSC–040, ¶¶ 1–4, 123 N.M. 739, 945 P.2d 957 (addressing entrapment issue on appeal from a conviction for possession of a controlled substance after the defendant bought the substance from an undercover police officer).

{22} The concepts behind entrapment and outrageous government conduct are implicated when the police aid in the commission of a crime as part of an investigative scheme designed to expose crimes that are difficult to detect. *Vallejos,* 1997–NMSC–040, ¶¶ 18–19, 123 N.M. 739, 945 P.2d 957. In this case, the police conduct at issue came about long after an apparent crime had been committed. By interrogating Child that night, Detectives Hall and Dilley were not attempting to lure Child into committing a crime; rather, they were attempting to obtain information from Child about a crime that had already been committed.

{23} We recognize that the children's court relied upon these entrapment and outrageous government conduct cases for the ability to conclude that the police conduct in this case was "objectively unconscionable [and] shocking, outrageous and clearly intolerable."

{24} To the extent that Defendant relies on *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952), for the proposition that outrageous government conduct, in the absence of an entrapment issue, may violate a defendant's due process rights so as to justify a dismissal, we disagree. In *Rochin,* the United States Supreme Court reversed a conviction because the police had obtained illegal drugs from the defendant by having a doctor forcibly pump the defendant's stomach to induce him to vomit the substance. *Id.* at 166, 72 S.Ct. 205. The Supreme Court concluded that the invasion of the defendant's privacy and the physical struggle to open his mouth and forcibly extract the drugs from his stomach was conduct that shocks the conscience and "offend[s] even hardened sensibilities." *Id.* at 172, 72 S.Ct. 205. However, *Rochin* may simply be read in historical perspective as a pre-*Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), case that requires certain evidence not be used in state prosecutions and requires reversals of convictions that use such evidence. Importantly, nothing in *Rochin* would sanction dismissal of a prosecution when none of the evidence proposed to be used therein was obtained by illegal, or even outrageous, means. Indeed, the Supreme Court does not generally consider dismissal to be a proper remedy in this context. *See United States v. Morrison,* 449 U.S. 361, 364–66, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981) (stating that remedies must be

tailored to the injury suffered from a constitutional violation and indicating that dismissal is inappropriate unless the prejudice suffered by a defendant cannot be remedied any other way).

{25} Even if *Rochin* would allow dismissal as a remedy, we do not believe it would apply to the circumstances of this case. Although the police conduct in this case raises questions, the district court had approved the installation of a listening device in Child's residence and the use of a ruse to do so. The interrogation of Child and the remainder of the police conduct do not reach the level of outrageous conduct discussed in *Rochin* in which the police invaded the defendant's bodily integrity and caused a physical disturbance to generate evidence. Therefore, despite the fact that the entrapment and outrageous government conduct doctrines implicate due process principles and invite a court to consider whether the police conduct was "outrageous, [or] offends notions of fundamental fairness, violates principles of fair and honorable administration of justice, or shocks the conscience," as the doctrines are generally applied, we do not believe they apply in the context of the interrogation in this case. *Vallejos*, 1997–NMSC–040, ¶ 17, 123 N.M. 739, 945 P.2d 957 (citations omitted); UJI 14–5161 (requiring a finding that the police "exceeded the bounds of permissible law enforcement conduct" in relation to whether the police helped induce the defendant to commit a crime for the defense of entrapment). We note that when the police officers act improperly, a civil action may lie to obtain redress. *See* 42 U.S.C. § 1983 (Supp.2000); NMSA 1978, § 41–4–12 (1977).

*Inherent Authority*

{26} The children's court also relied upon its inherent or supervisory powers to justify dismissal in this case. The court stated that it had the "duty to use its discretion [and] its supervisory powers to remedy the intentional violation of [Child's] statutory rights to protect judicial integrity and the fundamental fairness of the criminal justice system, and to deter future police and prosecutorial misconduct." Although we agree that these are commendable goals, we do not

believe that the inherent powers of a court support the dismissal of a criminal delinquency petition.

{27} Inherent judicial power is the power necessary to exercise the authority of the court. It exists so that a court may perform its functions. *State ex rel. N.M. State Highway & Transp. Dep't v. Baca*, 120 N.M. 1, 4, 896 P.2d 1148, 1151 (1995). Thus, even though specific judicial authority is not delineated by statute, or stated in a rule of court, a court may exercise authority that is essential to the court's fulfilling its judicial functions. This authority embraces the ability of a court to control its docket and the proceedings before it. *State v. Ahasteen*, 1998–NMCA–158, ¶ 28, 126 N.M. 238, 968 P.2d 328 (stating that court has inherent authority "to 'supervise and control the movement of all cases on its docket from the time of filing through final disposition,' and to apply sanctions when reasonable efforts to manage the court's caseload have failed") (quoting *State v. Ericksen*, 94 N.M. 128, 131, 607 P.2d 666, 669 (Ct.App.1980)). When a court's inherent powers are invoked to regulate conduct before the court, a court should do so " 'sparingly and with circumspection.' " *N.M. Right to Choose/NARAL v. Johnson*, 1999–NMSC–028, ¶ 27, 127 N.M. 654, 986 P.2d 450 (quoting *Baca*, 120 N.M. at 8, 896 P.2d at 1155).

{28} Under its inherent authority, a court may sanction parties and attorneys to ensure compliance with the proceedings of the court. *Baca*, 120 N.M. at 4, 896 P.2d at 1151; *Johnson*, 1999–NMSC–028, ¶ 27, 127 N.M. 654, 986 P.2d 450 ("[C]onduct in proceedings before a court or in defiance of a court's authority directly impacts the court's ability to perform its essential judicial functions."). In *Baca*, the district court had awarded attorney fees as a sanction for the bad-faith dismissal of an employee and subsequent litigation in both the district court and prior administrative proceedings. *Baca*, 120 N.M. at 4, 896 P.2d at 1151. Our Supreme Court distinguished the court proceedings from both the employee's dismissal and the previously-held administrative proceeding. *Id.* at 7–8, 896 P.2d at 1154–55. It concluded that the district court's inherent

authority did not extend to the administrative proceedings or the underlying conduct giving rise to the litigation. *Id.* Rather, according to the Court, "a court's inherent authority extends to all conduct before that court and encompasses orders intended and reasonably designed to regulate the court's docket, promote judicial efficiency, and deter frivolous filings." *Id.* at 8, 896 P.2d at 1155.

{29} Although *Baca* was a civil case, we believe its discussion of the limits of inherent authority would apply equally in the criminal context. First, we have looked with favor upon the United States Supreme Court rule that remedies for constitutional violations should be tailored to the injury suffered. *See State v. Pedroncelli,* 97 N.M. 190, 192, 637 P.2d 1245, 1247 (Ct.App.1981). Second, our Supreme Court recently reversed this Court's affirmance of a district court's dismissal in an opinion that can be reasonably construed as limiting a court's power to dismiss to very specific and narrowly tailored circumstances. *See State v. Brule,* 1999–NMSC–026, ¶ 14, 127 N.M. 368, 981 P.2d 782. Finally, our Supreme Court's recent opinion in *State v. Cardenas–Alvarez,* 2001–NMSC–017, ¶¶ 19–20, 130 N.M. 386, 25 P.3d 225, emphasized that, when our courts are concerned with the methods by which evidence is obtained, the remedy is to exclude that evidence from use in our state's courts. Thus, there is nothing in our precedents that would allow a court to exercise inherent authority to supervise anything or anyone that is not before the court or is not proposed to be used in court.

{30} In the case on appeal, the children's court dismissed the state's petition based upon police conduct occurring before the petition was brought. Like the dismissal of the employee and the administrative proceedings in *Baca*, the police conduct in question in this appeal was prelitigation conduct and not directly related to the proceeding before the court. As a result, the conduct was beyond the scope of the court's authority to administer sanctions.

*Conclusion*

{31} The children's court exceeded the scope of its power when it dismissed the delinquency petition against Child because of police misconduct. As a result, we reverse the court's order dismissing the petition.

{32} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD, Judge, and CELIA FOY CASTILLO, Judge.