**Certiorari Granted, October 18, 2013, No. 34,349**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2013-NMCA-105**

**Filing Date: September 5, 2013**

**Docket No. 32,215**

**TRACI and KENNETH HARRISON,**
**Individually and as Parents and Next**
**Friends of BRILEY HARRISON,**

      **Plaintiffs-Appellees,**

**v.**

**BOARD OF REGENTS OF THE UNIVERSITY**
**OF NEW MEXICO,**

      **Defendants-Appellants,**

**and**

**LOVELACE HEALTH SYSTEM, INC.,**
**a New Mexico Corporation, and ABQ**
**HEALTH PARTNERS, LLC,**

      **Defendants.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Alan M. Malott, District Judge**

Shapiro Bettinger & Chase LLP
Andrew D. Scholl
Carl J. Bettinger
Gregory W. Chase
Albuquerque, NM

for Appellee

Sutin, Thayer & Browne
Kerry Kiernan

Timothy J. Atler
Albuquerque, NM

Office of University Counsel
K. Lee Peifer
Kimberly N. Bell
Albuquerque, NM

for Appellants

## OPINION

**VANZI, Judge.**

**{1}**     The formal opinion filed in this case on August 28, 2013, is hereby withdrawn, and this opinion is substituted in its place.

**{2}**     District courts have the inherent authority to "impose a variety of sanctions on both litigants and attorneys in order to regulate their docket, promote judicial efficiency, and deter frivolous filings." *State ex rel. N.M. State Highway & Transp. Dep't v. Baca*, 1995-NMSC-033, ¶ 11, 120 N.M. 1, 896 P.2d 1148 (internal quotation marks and citation omitted). The question raised in this appeal is whether a district court's inherent power to impose sanctions includes the authority to issue a non-compensatory monetary sanction against a public entity. We answer this question in the affirmative and therefore affirm the district court's imposition of a $100,000 sanction against Defendant-Appellant, the Board of Regents of the University of New Mexico (the Regents), for willful and improper interference with a disclosed witness in a matter pending before the district court.

## BACKGROUND

**{3}**     The facts underlying the imposition of sanctions in this case are not disputed by the Regents on appeal. We therefore rely extensively below on the factual background that was set forth in the district court's letter decision imposing sanctions.

**{4}**     In August 2009, Plaintiffs filed suit in district court against the Regents, along with other parties, alleging medical malpractice in connection with a cesarean section/tubal ligation surgery performed by physicians employed by the University of New Mexico (UNM) Health Sciences Center. Plaintiffs subsequently retained Dr. Ian Paul to serve as an expert witness in their case. At the time, Dr. Paul was a pathologist employed by the New Mexico Office of the Medical Examiner (OMI) and was also a clinical assistant professor in the Department of Pathology at the UNM Health Sciences Center. The conduct that led the district court to impose sanctions against the Regents in this case occurred upon Plaintiffs' formal designation of Dr. Paul as one of their expert witnesses.

2

**{5}**      Scot Sauder, an attorney employed as in-house counsel by UNM, learned of Dr. Paul's designation as one of Plaintiffs' medical expert witnesses.  Sauder concluded that Dr. Paul's participation in the case was not in the best interests of the UNM Health Sciences Center and, by extension, the Regents.  At the time, Sauder was the head of the health law section of the University Counsel's office and was also serving as the manager of litigation involving UNM Health Sciences Center, which included oversight of Plaintiffs' case.  Sauder initially communicated his concerns regarding Dr. Paul's expert testimony in the case with Dr. Paul Roth, the chancellor of UNM Health Sciences Center, and he received unquestioned approval from Dr. Roth to contact Dr. Paul's supervisors regarding the matter.  Sauder then contacted Dr. Ross Zumwalt, who was Dr. Paul's immediate supervisor at OMI, to inform him of Dr. Paul's plan to testify against another UNM physician and to end Dr. Paul's participation in the case.  Dr. Zumwalt responded that he was familiar with Plaintiffs' case as Dr. Paul had already informed him of his plan to testify as an expert witness for Plaintiffs in the case.  Dr. Zumwalt further stated, "I am sure the Regents desire that this case be evaluated by competent, qualified, and unbiased experts.  The Regents are fortunate that Dr. Paul fits those criteria."

**{6}**      Sauder also spoke with Dr. Paul's supervisor, Dr. Thomas Williams, the head of the UNM Department of Pathology; however, nothing further happened until the case neared the mediation deadline set by the district court approximately three months later.  At that time, Sauder contacted both of Dr. Paul's supervisors, again suggesting that Dr. Paul's involvement in the case as Plaintiffs' expert created a conflict of interest with the UNM Health Sciences Center.  He also informed them that Dr. Roth agreed with him and that he believed Dr. Paul should withdraw from the engagement.  The next day, Sauder reached to outside counsel hired by the Regents to represent UNM in the litigation and informed her that Dr. Paul would not be testifying in the case.  Sauder later testified that by the time he contacted outside counsel, he had already been assured by Dr. Williams that Dr. Paul would be withdrawing from the case.  However, Dr. Williams testified that he offered no such assurance to Sauder.  In fact, both of Dr. Paul's supervisors later testified that they did not believe it was appropriate or necessary for Dr. Paul to withdraw from the case.

**{7}**      Within days of Sauder's communications with Dr. Paul's supervisors, Dr. Paul withdrew from the case.  In an email to Plaintiffs' trial counsel informing him of his decision, Dr. Paul stated that he had been under "a lot of pressure from the higher ups at UNM" to withdraw.  The district court noted that at the time these events unfolded, Dr. Paul was under consideration for a significant job promotion.  Dr. Paul later testified that he felt intimidated and feared that his career was in jeopardy.  He stated that he would not have withdrawn from the case but for Sauder's actions.

**{8}**      Upon Dr. Paul's withdrawal from the case, Plaintiffs filed a motion in district court seeking sanctions against the Regents and their attorney, Sauder.  Plaintiffs argued that the manner in which Sauder caused Dr. Paul to withdraw from the case amounted to improper witness interference and tampering and was a violation of a number of the Rules of Professional Conduct governing attorneys.  It also established that Sauder acted with the full

3

support and encouragement of Dr. Roth. The district court held two hearings on Plaintiffs' motion for sanctions. However, by the time the second hearing was held on Plaintiffs' motion, the parties had already reached a settlement for the claims in the underlying case.

{9} Following the hearings, the district court issued a letter decision imposing sanctions against the Regents and Sauder. The court stated in the decision that it was not persuaded by Sauder's position at the sanctions hearings that Dr. Paul's involvement in the case constituted an impermissible conflict of interest. The court found that there were no applicable policies in effect at UNM under which Dr. Paul's decision to testify as an expert for Plaintiffs created an impermissible conflict of interest with the UNM Health Sciences Center. The court stated "[t]hat any public entity, let alone the flagship University of this State, believes it has such power to stifle comment is both terrifying and in violation of public policy[.]" In addition, the court pointed out that Sauder could have, but failed to, file a motion in open court in an attempt to prevent Dr. Paul from testifying, which would have allowed both parties to develop their arguments and would have provided the district court with an opportunity to determine whether Dr. Paul's testimony would have been unduly prejudicial to UNM or otherwise improper. The court found that Sauder instead acted "internally, quietly . . . willfully and improperly interfered with a disclosed witness in pending litigation before [the c]ourt" and that "[s]uch conduct was prejudicial to the interests of the witness, the other litigants, and the administration of justice itself." The court also pointed out that Sauder's " 'behind the scenes' interference with a witness is just the kind of conduct that fosters distrust and disdain for our profession and the [c]ourt system."

{10} In determining that it could exercise "its inherent powers to control its docket and, by extension, the behavior of litigants" to sanction Sauder and the Regents for their wrongful conduct, the court noted that monetary sanctions were appropriate in the matter since the underlying dispute between the parties had been settled. It further stated that the amount of monetary sanctions had to be "sufficiently significant in light of the misconduct at issue and the relative size and resources of the wrongdoers." Accordingly, the district court ordered the Regents to pay $32,000 to Plaintiffs for the attorney fees they had incurred in bringing the motion for sanctions, the costs associated with locating a replacement for Dr. Paul, and the fees that Plaintiffs incurred for Dr. Paul's services prior to his withdrawal. Sauder was personally sanctioned in the amount of $1500 to be paid to the Roadrunner Food Bank. Lastly, the court sanctioned the Regents in the amount of $100,000 to be paid to four charitable organizations.

{11} The Regents moved for reconsideration of the district court's order, challenging only the imposition of the $100,000 monetary sanction in their motion for reconsideration. The Regents argued that the district court lacked the authority under its inherent power to impose the $100,000 sanction because it was a punitive sanction in nature with no compensatory aspect. They based their argument that such a sanction is not permitted against a public entity such as the Regents under New Mexico law because such sanctions are punitive and governmental entities are immune from punitive damages in civil actions for tort and contract. The district court denied the Regents' motion, concluding that the Regents'

4

argument that the court's inherent power does not include the authority to issue a non-compensatory monetary sanction against a public entity was without merit. Noting that few actions pose as dire a threat to the integrity of the courts as a litigant's interference with witnesses, the district court's order further stated that the Regents' conduct struck "at the very core of the integrity of the judicial system and warrants the imposition of sanctions that do more than merely compensate the other party for their fees and expenses incurred in bringing the misconduct to the court's attention. [The Regents'] conduct is an affront to the court and every citizen of this state. Such an affront warrants imposition of sanctions severe enough to put a stop to the practice." (Internal quotation marks and citation omitted.) This appeal followed.

## DISCUSSION

**{12}** The dispositive issue raised in this appeal is whether a district court's inherent power to impose sanctions for a party's misconduct during litigation includes the authority to issue a non-compensatory monetary sanction against a public entity. On appeal, the Regents contend that the district court lacked the authority under its inherent power to impose the $100,000 non-compensatory monetary sanction against them because the sanction is purely punitive in nature and therefore is not permitted against a public entity, such as the Regents, under existing New Mexico case law and public policy grounds.

**{13}** Before we turn to address the Regents' specific arguments, we first explain the very limited nature of our appellate review in this case. The Regents' arguments in this appeal—as they were before the district court—are purely legal in nature; that is, the Regents do not challenge the underlying facts that led the district court to impose sanctions against the Regents as an exercise of the court's inherent power. Specifically, the Regents do not address whether the underlying facts of this case supported the imposition of the non-compensatory monetary sanction, whether the circumstances were sufficiently egregious to support the amount of the sanction, or the fact that the sanction was to be paid to four charitable organizations. The Regents also raise no argument as to the propriety of the other sanctions imposed by the district court. We therefore do not address those aspects of the district court's decision, and our appellate review is limited to the issue of addressing whether, assuming the Regents' conduct was sanctionable, the district court had the authority at all to impose a monetary sanction outside of a compensatory award for costs and attorney fees. *See In re Doe*, 1982-NMSC-099, ¶ 3, 98 N.M. 540, 650 P.2d 824 (stating that appellate courts should not reach issues that the parties have failed to raise in their briefs).

### A.    Standard of Review

**{14}** We generally review a district court's imposition of sanctions under its inherent power for an abuse of discretion. *Restaurant Mgmt. Co. v. Kidde-Fenwal, Inc.*, 1999-NMCA-101, ¶ 8, 127 N.M. 708, 986 P.2d 504; *see Gonzales v. Surgidev Corp.*, 1995-NMSC-047, ¶¶ 31, 33, 120 N.M. 151, 899 P.2d 594. However, "even when we review for an abuse of discretion, our review of the application of the law to the facts is conducted de

novo." *N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-028, ¶ 7, 127 N.M. 654, 986 P.2d 450 (internal quotation marks and citation omitted). "Accordingly, we may characterize as an abuse of discretion a discretionary decision that is premised on a misapprehension of the law." *Id.* (alteration, internal quotation marks, and citation omitted). In this case, the dispositive issue on appeal is a legal question, to which we apply de novo review. If we conclude that the district court erred as a matter of law, then it necessarily follows that the district court abused its discretion in imposing the $100,000 sanction against the Regents because the decision was based on a misapprehension of the law.

## B.     The Regents' Arguments

{15}     "Inherent judicial power is the power necessary to exercise the authority of the court" and includes the authority to sanction. *In re Jade G.*, 2001-NMCA-058, ¶ 27, 130 N.M. 687, 30 P.3d 376. "The rationale underlying the existence of the inherent power of the courts is that a court must be able to command the obedience of litigants and their attorneys if it is to perform its judicial functions." *Restaurant Mgmt. Co.*, 1999-NMCA-101, ¶ 11 (internal quotation marks and citation omitted). "Under its inherent authority, a court may sanction parties and attorneys to ensure compliance with the proceedings of the court." *In re Jade G.*, 2001-NMCA-058, ¶ 28.

{16}     A fundamental aspect of a court's exercise of its inherent power is the principle that a court's inherent authority extends to all conduct before the court and to all parties appearing before the court, regardless of the party's status as a private litigant or as a governmental/public entity. *See Baca*, 1995-NMSC-033, ¶ 27 (noting that "a court's inherent authority extends to all conduct before that court"); *State v. Blenden*, 748 So. 2d 77, 88-89 (Miss. 1999) (stating that "a court's inherent power to control actions before [it] is equally applicable to the [s]tate. When the [s]tate enters the court as a litigant, it places itself on the same basis as any other litigant; subjecting itself to the inherent authority of the court to control actions before it, just as any other litigant"); *see also Noble Cnty. v. Rogers*, 745 N.E.2d 194, 198-99 (Ind. 2001) (emphasizing that "[i]t is beyond question that [a court's inherent] power extends to governmental attorneys and parties" and that "while the [l]egislature may shield the [s]tate from substantive tort liabilities, it may not immunize the [s]tate from [the judiciary's inherent] power to sanction the attorneys and parties appearing before [the court]"). It follows that a district court's *authority* to impose sanctions under its inherent power is not curtailed by the fact that the wrongful party happens to be a governmental or public entity. We note that prior New Mexico appellate decisions have upheld a lower court's authority to impose sanctions against a governmental or public entity as a valid exercise of that court's inherent power. *See, e.g.*, *Baca*, 1995-NMSC-033, ¶¶ 13, 23 (holding that a New Mexico court may invoke its inherent power to award attorney fees as a sanction against the state for bad faith litigation); *State v. Candelaria*, 2008-NMCA-120, ¶ 22, 144 N.M. 797, 192 P.3d 792 (upholding the metropolitan court's dismissal of a criminal prosecution as a sanction against the state as a valid exercise of that court's inherent authority).

**{17}**     In the case before us, the Regents maintain that they do not challenge the district court's authority to exercise its inherent power against both public entities and private litigants.  Instead, they raise a challenge to the nature of the sanction that a district court may impose against a public entity under the court's exercise of its inherent power.  Specifically, the Regents contend that the monetary sanction imposed against them constitutes an impermissible sanction because it was not compensatory in nature—that is, it was not intended for Plaintiffs' benefit at all—and instead, was solely a punitive sanction designed to punish the Regents for their conduct and to act as deterrence.  Thus, according to the Regents, while a district court has the inherent authority to impose non-compensatory monetary sanctions against private litigants, their lawyers, or witnesses, it has no such corresponding authority with regard to public entities regardless of the egregiousness of their conduct.  Relying exclusively on *Torrance County Mental Health Program v. New Mexico Health & Environment Department*, 1992-NMSC-026, 113 N.M. 593, 830 P.2d 145, and *Baca*, the Regents contend that New Mexico case law and public policy clearly establish that district courts are prohibited from imposing a purely punitive sanction against a public entity.

**1.     The Supreme Court's Decisions in *Torrance County* and *Baca* Do Not Dictate Reversal of the Non-Compensatory Monetary Sanction Imposed by the District Court**

**{18}**     As an initial matter, we reject the Regents' argument that our Supreme Court's decisions in *Torrance County* and *Baca* are controlling.  In *Torrance County*, our Supreme Court held that punitive damages are not recoverable from a governmental entity in a breach of contract action.  *See* 1992-NMSC-026, ¶ 2.  The question there was whether our Legislature's silence on punitive damages could be read as expressing an intention to waive immunity for punitive damages in contract cases.  *Id.* ¶ 16.  In reaching its holding, the Court weighed policy interests favoring the recovery of punitive damages against those favoring immunity for governmental entities.  *Id.* ¶¶ 24-31.  The Court ultimately concluded that the policy interests in favor of granting immunity to governmental entities—such as the need to protect public revenues and the injustice of punishing innocent taxpayers rather than the officials at fault, *id.* ¶¶ 27-29—outweighed the countervailing policy interests favoring the recovery of punitive damages—deterring abuse of governmental power and promoting accountability among government officials, *id.* ¶ 25.  The Court stated that allowing civil juries to assess punitive damages against governmental entities in breach of contract cases would "punish[] only the taxpayers, who took no part in the commission of the [wrongful act]" and be a "windfall to a fully compensated plaintiff."  *Id.* ¶ 28 (internal quotation marks and citation omitted).

**{19}**     *Torrance County* is not controlling in this case for two reasons.  First, the Supreme Court's analysis in *Torrance County* did not include any consideration or application of the concept of a district court's inherent power and, in particular, its inherent power to sanction conduct that abuses the judicial process.  *See Fernandez v. Farmers Ins. Co. of Ariz.*, 1993-NMSC-035, ¶ 15, 115 N.M. 622, 857 P.2d 22 (stating the general rule that "cases are not

7

authority for propositions not considered" (internal quotation marks and citaiton omitted)). Second, *Torrance County* concerned the award of punitive damages by civil juries, which is a distinct legal concept from the exercise of a court's inherent power to impose a monetary sanction for misconduct by litigants, their lawyers, and others who participate in judicial proceedings over which the judge is presiding. Although there are several differences between the punitive damage awards and non-compensatory monetary sanctions, we point to the following: (1) "[t]he award of punitive damages is based on a party's misconduct toward[] the individual[,]" whereas "[a]n award of sanctions is based on a party's misconduct toward[] the court," *Gonzales*, 1995-NMSC-047, ¶¶ 12-13; (2) punitive damage awards are entrusted to a fact finder, while the assessment of sanctions falls solely within the ambit of the court's constitutional power; and (3) "[p]unitive damages . . . are not intended to compensate the injured party," *Torrance County*, 1992-NMSC-026, ¶ 28, while sanctions imposed under the court's inherent authority can be both compensatory and punitive in nature, *see Baca*, 1995-NMSC-033, ¶ 22. Consequently, we see no basis for applying *Torrance County* to the case before us.

**{20}** We are likewise not persuaded by the Regents' reliance on *Baca*. In *Baca*, the Supreme Court held that a district court can exercise its inherent power to award attorney fees against a governmental entity for bad faith litigation. 1995-NMSC-033, ¶¶ 12, 18. Similar to the Regents' position in this case, the governmental entity in *Baca* argued that a sanction of attorney fees could not be imposed against them based on their status as a governmental entity under the Supreme Court's earlier decision in *Torrance County*. *See Baca*, 1995-NMSC-033, ¶ 18. The Court disagreed and concluded instead that there were distinct differences between attorney fees and punitive damages awards. *See id.* ¶¶ 21-23 (noting that there are certain checks upon an attorney fees award that are absent from a punitive damages award and that attorney fees have both compensatory and punitive aspects, whereas the purpose of punitive damages awards is punishment and deterrence). The Court also balanced public policy concerns and determined that, while the depletion of public revenues and the punishment of innocent taxpayers were important considerations that weighed against the assessment of attorney fees against governmental litigants, "those considerations *must be subordinate* to a court's authority to control the parties and the litigation before it." *Id.* ¶ 25 (emphasis added). On this basis, the Court upheld the sanction of attorney fees as an appropriate exercise of the district court's inherent power.

**{21}** The Regents contend that *Baca* stands for the proposition that a monetary sanction imposed against a public entity under a court's inherent power can only be upheld where the sanction has a compensatory effect. We disagree that our Supreme Court advanced such a rule in *Baca*. Our Supreme Court did not hold, much less convey a view, in *Baca* that sanctions without a compensatory aspect are the equivalent of a punitive damages award. And while our Supreme Court relied upon the fact that the payment of attorney fees have both compensatory and punitive effects as a means of distinguishing attorney fees from punitive damages awards, this was just one aspect of the Court's analysis and did not form the sole basis for the Court's holding. We thus decline to apply the unique characteristics of attorney fee sanctions raised in *Baca* in the broad manner suggested by the Regents.

8

**2. The Public Policy Arguments Advanced by the Regents Do Not Outweigh a District Court's Authority Under Its Inherent Power to Impose a Non-Compensatory Monetary Sanction**

**{22}** The Regents argue that a non-compensatory monetary sanction imposed against a public entity punishes innocent taxpayers who took no part in the wrongful conduct and depletes public revenues and, therefore, similar to *Torrance County*, these public policy concerns dictate that a district court cannot exercise its inherent power to impose a purely punitive monetary sanction against a public entity. Although we do not take lightly the policy concerns raised by the Regents in this case, we ultimately conclude that these concerns are "subordinate to a court's authority to control the parties and the litigation before it." *Baca*, 1995-NMSC-033, ¶ 25. We explain.

**{23}** First, we do not view the Regents' contention that a purely punitive monetary sanction serves to deplete public revenues and must therefore be avoided as a justifiable basis for limiting the authority of the district court to impose a monetary sanction against a public entity. Indeed, any sanction imposed against a public entity for disruption of the judicial process arguably results in an expenditure of public funds. Even in cases where the sanction imposed is compensatory in nature, such as the awarding of costs or attorney fees incurred as a result of the misconduct, the same potential for the depletion of public revenues would occur. We note, for example, that the Regents were assessed—and paid without complaint—$32,000 for the attorney fees that Plaintiffs had incurred in bringing the motion for sanctions, the costs associated with locating a replacement for Dr. Paul, and the fees that Plaintiffs incurred for Dr. Paul's services prior to his withdrawal.

**{24}** Moreover, assuming that the Regents are correct that the $100,000 sanction imposed by the district court was solely punitive in nature, we nevertheless do not share their concern that the punitive nature of the sanction alone—i.e. the fact that the sanction punishes innocent taxpayers—is enough to render the sanction inappropriate on public policy grounds. In our view, sanctions are punitive by their very nature. *See Black's Law Dictionary* 1458 (9th ed. 2009) (defining a "sanction" as "a penalty or coercive measure that results from failure to comply with a law, rule, or order"); *see also Warner v. Sw. Desert Images, LLC*, 180 P.3d 986, 1001 (Ariz. Ct. App. 2008) ("A sanction is by definition punitive or coercive in nature."). That is, sanctions such as the dismissal of a case, default judgments, exclusion of witnesses or evidence, and monetary fines all necessarily include some degree of punishment and deterrence for the wrongful party. For example, in the criminal context, we have upheld a lower court's exercise of inherent power to dismiss a criminal prosecution as a sanction against the government, *see Candelaria*, 2008-NMCA-120, ¶ 22, despite recognizing that the extreme sanction of dismissal "punishes the public, not the prosecutor, and results in a windfall to the defendant." *State v. Jackson*, 2004-NMCA-057, ¶ 15, 135 N.M. 689, 92 P.3d 1263 (internal quotation marks and citation omitted). The policy behind a district court's inherent authority is the need to prevent abusive litigation practice and preserve the integrity of the judicial process. It makes little sense to effectively strip a court of its equitable power to control and punish the misconduct of those litigants associated with

9

public entities. To do so would effectively allow a public entity to hide behind a protective shield thus giving it permission to engage in unethical conduct for which a private litigant would surely be sanctioned. Accordingly, we decline to adopt a per se rule that a district court cannot exercise its inherent power to impose a non-compensatory monetary sanction against a public entity simply because the sanction may have a punitive effect.

**{25}** Finally, we must emphasize the unique procedural posture of this case. During the course of the sanctions proceedings, the parties settled the underlying claims. Thus, by the time the district court issued its letter decision imposing sanctions, the options for sanctions available in the case were severely limited. Under these circumstances, the district court chose a sanction that avoided many of the policy pitfalls the Regents complain of on appeal. The imposition of a non-compensatory monetary sanction ensured that there was no windfall to Plaintiffs yet would sufficiently deter the type of abusive conduct by litigants that occurred here in the future.

**{26}** As a final matter, we reiterate the narrow holding in this case. We decide only that a district court's inherent power to award non-compensatory monetary sanctions applies equally to public and private entities. We recognize that a court's inherent powers are not unfettered and should be invoked "sparingly and with circumspection." *Baca*, 1995-NMSC-033, ¶ 25. However, here, the Regents did not argue before the district court—and do not argue on appeal—that the court's factual findings of misconduct were erroneous or not based on substantial evidence. Nor do they argue that the conduct did not rise to a level warranting sanctions, that the amount of the sanction was not proportional to the violation, or that the monetary distribution of the sanctioned sum to four charitable organizations was inappropriate. Therefore, we do not address these questions in this opinion.

**{27}** Based on the foregoing, we conclude that a district court's inherent power to impose sanctions includes the authority to issue a non-compensatory monetary sanction against a public entity.

**CONCLUSION**

**{28}** We affirm the district court's imposition of the $100,000 non-compensatory monetary sanction against the Regents. We deny Plaintiff's request for attorney fees incurred on appeal.

**{29}** **IT IS SO ORDERED.**

_____

**LINDA M. VANZI, Judge**

**I CONCUR:**

_____

10

**M. MONICA ZAMORA, Judge**

**TIMOTHY L. GARCIA, Judge (dissenting)**

**GARCIA, Judge (dissenting).**

**{30}**     I respectfully dissent in this case and view the issue very narrowly.  Regents do not contest the position that the district court can properly impose compensatory sanctions against a governmental entity as part of its inherent authority.  Nor do they appeal the award of the compensatory sanction imposed by the district court.  Instead, Regents ask this Court to determine as a matter of first impression whether the district court has the right to exercise its inherent legal authority to impose a purely punitive sanction against a governmental entity for improper conduct during a legal proceeding.  I disagree with the majority's holding that such an inherent right exists.  *See* Majority Opinion ¶¶ 14-26.

**{31}**     The majority labels the sanction imposed by the district court as a "non-compensatory monetary sanction," Majority Opinion ¶¶ 1, 11, 22, 26, and rejects Regents' position that the $100,000 sanction was purely punitive.  Majority Opinion ¶¶ 20, 23.  Yet the majority also recognizes that the sanction was issued for the purpose of being "severe enough to put a stop to the practice" based upon "the misconduct at issue and the relative size and resources of the wrongdoers. . . . [The court must] do more than merely compensate the other party for their fees and expenses incurred."  Majority Opinion ¶¶ 9-10.  Where a sanction has no compensatory component and is issued exclusively for the purpose of punishment and deterrence, the sanction is the equivalent of a punitive damages award.  *See Baca*, 1995-NMSC-033, ¶¶ 21-22.  Here, the underlying case had settled, and Regents was separately sanctioned for the entire amount of Plaintiffs' compensatory expenses associated with Sauder's misconduct, including attorney fees, costs, and other related fees.  Majority Opinion ¶ 9.  As a result and based upon the primary legal argument comparing the monetary sanction award against Regents to a punitive damage award against a governmental entity, the term "punitive sanction" is the appropriate term for the $100,000 sanction awarded in this case.

**{32}**     Regents limit their appeal to the punitive sanction awarded and the recognized immunity governmental entities have from punitive damages under *Baca* and *Torrance County*.  Majority Opinion ¶¶ 15-16.  The majority distinguishes the public policy grounds for this governmental immunity based upon a need for additional control over abuses that occur during the judicial process and the distinct legal concept for a jury award of damages versus misconduct during judicial proceedings.  Majority Opinion ¶ 18.  It then asserts that misconduct toward the court must be given greater weight than misconduct toward a party when punitive punishment of a governmental entity is a consideration.  *Id.*

**{33}**     The majority correctly recognizes the competing public policy interests regarding the award of punitive damages against a governmental entity that were addressed in *Torrance County*.  Majority Opinion ¶ 17.  The need to protect public revenues and to prevent the

11

injustice of punishing innocent taxpayers rather than the officials at fault must be balanced against the need to deter abuse of governmental power and to promote accountability among governmental officials. *Id.* However, the majority failed to address the competing public interests any further in its analysis. The majority instead continues its public policy analysis by citing *Baca* to rely upon the district court's authority to impose attorney fees as a sanction and justify tipping the public policy scales in favor of awarding punitive sanctions for the purpose of "control[ling] the parties and the litigation." Majority Opinion ¶ 21. This effort to distinguish the public policy decision expressed by our Supreme Court in *Baca* and *Torrance County* is misplaced for two reasons.

**{34}** First, the competing public policy concerns must be addressed directly in order to determine whether an actual need to impose punitive sanctions against a governmental entity is necessary for the district court to control the parties and cases in the courtroom. Compared to our juries, the district court already has significant non-punitive power and authority to control the parties and the litigation under its jurisdiction. *Baca*, 1995-NMSC-033, ¶ 11 (recognizing that district courts have inherent power "[t]o fine for contempt, imprison for contumacy, enforce the observance of order" on "both litigants and attorneys," and to impose a variety of sanctions "in order to regulate [its] docket, promote judicial efficiency, and deter frivolous filings" (internal quotation marks and citation omitted)); *State ex rel. Schwartz v. Kennedy*, 1995-NMSC-069, ¶ 41, 120 N.M. 619, 904 P.2d 1044 (suspending or revoking a license for noncompliance with the conditions governing its issuance was recognized as an appropriate regulatory sanction); *United Nuclear Corp. v. Gen. Atomic Co.*, 1980-NMSC-094, ¶ 201, 96 N.M. 155, 629 P.2d 231 (permitting a district court to impose a variety of sanctions to command and enforce compliance with discovery orders); *State v. Martinez*, 1998-NMCA-022, ¶ 6, 124 N.M. 721, 954 P.2d 1198 (allowing the district court to impose a variety of sanctions on a defendant who fails to include a witness he or she intends to call at trial, "including granting a continuance, prohibiting the party from calling a witness not disclosed, or entering such other order as it deems appropriate under the circumstances"); *Enriquez v. Cochran*, 1998-NMCA-157, ¶¶ 18, 48, 126 N.M. 196, 967 P.2d. 1136 (affirming the striking of its affirmative defenses and imposing a specific duty of care on the Boys Scouts of America as a discovery sanction); *Rhinehart v. Nowlin*, 1990-NMCA-136, ¶ 28, 111 N.M. 319, 805 P.2d 88 (permitting the district court to hold a civil contempt proceeding "to coerce or force compliance with a court order, or in the alternative, [to] impose sanctions by way of compensating the aggrieved party and awarding that party his or her attorney fees and costs"); *State ex rel. Bardacke v. Welsh*, 1985-NMCA-028, ¶ 19, 102 N.M. 592, 698 P.2d 462 (explaining that the sanction of injunction "is warranted when the courts are being used as a vehicle of harassment").

**{35}** In a real sense, these examples illustrate that the existing sanction powers possessed by the courts are much broader than a jury's power to deter an abuse of power or promote accountability among governmental officials. In this case, the $1,500 sanction imposed directly against Sauder is just one example of the latitude given to the court that is not available to a jury. However, the broader punitive sanction of $100,000 that is neither paid by Sauder nor capable of jeopardizing his public position or office would offer no further

12

deterrent or other value to the public policy being implemented. Rather than punishing the public official who committed the wrongful act, it is simply borne by innocent taxpayers. The court, not the jury, already has broad power to issue effective compensatory sanctions in order to deter any abuse of power and promote accountability among governmental officials who appear in the courtroom. The majority's justification for imposing an additional punitive sanction against the public weighs heavily against the argument that the courts, rather than juries, might need the additional authority to impose a purely punitive award in order to deter an abuse of power and promote accountability among governmental officials.

**{36}** Second, the majority's position presumes that the jury process is incapable of imposing punitive awards against a governmental entity in order to fulfill public policy goals but that the courts possess some higher degree of capacity or understanding when it comes to imposing punitive awards against the government. Such a presumption is erroneous. It undermines the jury component of our legal system, the unique legal element that is one of the most profound and respected aspects of our democratic society. *See State v. Mann*, 2000-NMCA-088, ¶ 84, 129 N.M. 600, 11 P.3d 564 (recognizing the profound democratic function played by juries in a criminal prosecution); *First Nat'l Bank v. Nor-Am Agric. Prods., Inc.*, 1975-NMCA-052, ¶ 50, 88 N.M. 74, 537 P.2d 682 (recognizing juries as "the institution best suited to reflect the sense of fairness and the conflicting values of a democratic order"); *see also Axelrod v. Phillips Acad.*, 74 F. Supp. 2d 106, 109 (D.C. Mass. 1999) (recognizing juries as "the foundation of our jurisprudence in a constitutional democracy"); *Holland v. State*, 587 So. 2d 848, 877 (Miss. 1991) (Hawkins, J., dissenting) ("Judgment as to what is a 'just' or 'right' decision can change with the times. Nothing, however, can match the comfort of having men and women of your own stature pass upon the merits of your case. The public at large in turn feels far more comfortable with a [twelve]-man jury verdict, whatever it is, than it would with the same result having been reached by some judge.").

**{37}** It is an unfortunate mistake to presume that judges and not juries possess the exclusive knowledge and ability to determine when a purely punitive award must be imposed on a governmental entity and then paid by innocent taxpayers from public revenues. I disagree with the majority view and believe the Supreme Court's analysis in *Baca* directs otherwise. *See* 1995-NMSC-033, ¶¶ 21-25.

_____
**TIMOTHY L. GARCIA, Judge**

**Topic Index for *Harrison v. UNM Bd. of Regents*, No. 32,215**

**APPEAL AND ERROR**
Standard of Review

**CIVIL PROCEDURE**
Expert Witnesses
Sanctions

**GOVERNMENT**
Education and Schools

**EVIDENCE**
Expert Witness
Tampering with Evidence
Witnesses

**REMEDIES**
Punitive Damages

**TORTS**
Medical Malpractice